Lieutenant Colonel Jane ABLE, Petty Officer Robert Heigl, First Lieutenant Kenneth Osborn, Sergeant Steven Spencer, Lieutenant Richard von Wohld, and Seaman Werner Zehr, Plaintiffs,

v.

UNITED STATES of America, William J. Perry Secretary of Defense, in his official capacity, and Federico Peña, Secretary of Transportation, in his official capacity, Defendants.

No. 94 CV 0974.

United States District Court, E.D. New York.

July 2, 1997.

Lambda Legal Defense & Education Fund (Beatrice Dohrn, Evan Wolfson, and Ruth Harlow, of counsel), New York City, for plaintiffs.

American Civil Liberties Union Foundation (Marc E. Elovitz and Matthew Coles, of counsel), New York City, for plaintiffs.

United States Department of Justice (Frank W. Hunger, Assistant Attorney General, Zachary W. Carter, United States Attorney for the Eastern District of New York, Charles S. Kleinberg, Assistant United States Attorney, David J. Anderson, Vincent M. Garvey, and Mark T. Quinlivan, Attorneys, of counsel), Washington, DC, for defendants.

Department of the Army, Office of the Judge Advocate General (Major Douglas K. Mickle, of counsel), for defendants.

## MEMORANDUM AND ORDER

NICKERSON, District Judge:

The United States Court of Appeals for the Second Circuit remanded this case to this court to decide whether or not section 571(b)(1) of the National Defense Authorization Act for the Fiscal Year 1994, 10 U.S.C. § 654(b)(1) (the Act), complies with the Constitution. *Able v. United States*, 88 F.3d 1280 (2d Cir.1996).

### I.

Plaintiffs, six homosexuals serving in the Armed Forces or the Coast Guard, brought the case to challenge 10 U.S.C. § 654(b) of the Act, by which Congress enacted the so-called "Don't Ask, Don't Tell" policy concerning homosexuals in the armed forces.

Section 654(b) contains two subsections subjecting homosexuals to mandatory discharge.

Subsection (b)(1) requires dismissal of any member of the armed forces who "has engaged in, or solicited another to engage in a homosexual act or acts," unless he or she satisfies five conditions, including demonstrating that he or she "does not have a propensity or intent to engage in homosexual acts."

"Homosexual act" is defined to mean "(A) any bodily contact, actively undertaken or passively permitted, between members of the same sex for the purpose of satisfying sexual desires, and (B) any bodily contact which a reasonable person would understand to demonstrate a propensity or intent to engage in an act described in subparagraph (A)." 10 U.S.C. § 654(f)(3).

A "homosexual act" thus includes not merely sodomy, which is punishable severely whether committed by heterosexuals or homosexuals under an article not challenged by plaintiffs of the Uniform Code of Military Justice, but also "any bodily contact" between those of the same sex that a "reasonable person would understand to demonstrate a propensity or intent" to engage in some other act to satisfy sexual desires.

Subsection (b)(2) of the Act requires discharge of any member who "has stated that he or she is a homosexual or bisexual, or words to that effect" (including, according to the Directives issued under the Act, "I have a homosexual orientation"), unless the member demonstrates that he or she is "not a person who engages in, attempts to engage in, has a propensity to engage in or intends to engage in homosexual acts."

This court declined to determine the constitutionality of subsection (b)(1) relating to homosexual acts on the ground plaintiffs lacked standing to challenge that provision. *Able v. United States*, No. 94 CV 0974, 1995 WL 116322 (E.D.N.Y. Mar.14, 1995). The court also held that subsection (b)(2) relating to statements of homosexual orientation impermissibly regulated speech based on content in violation of the First Amendment. *Able v. United States*, 880 F.Supp. 968 (E.D.N.Y.1995).

On appeal, the Court of Appeals determined that plaintiffs had standing to challenge subsection (b)(1) and that the constitutionality of subsection (b)(2) hinged on that of the other subsection. The Court said that the two subsections "rise or fall together," that the restriction on speech in (b)(2), while valid assuming subsection (b)(1) was valid, was "incidental and wholly subservient to the restriction on acts" in (b)(1), and that "[t]he government does not contend (nor could it) that in the event that § 654(b)(1) is held to be unconstitutional, § 654(b)(2) may still be upheld." *Able*, 88 F.3d at 1292, 1300. Accordingly, the Court of Appeals remanded for this court to decide whether subsection (b)(1) comports with equal protection.

## II.

The Equal Protection Clause of the Fourteenth Amendment to the Constitution provides that no State shall "deny to any person within its jurisdiction the equal protection of the laws." The Supreme Court has decided that the Due Process Clause of the Fifth Amendment imposes the same constitutional requirements on the federal government as the Equal Protection Clause imposes on state governments. *Weinberger v. Wiesenfeld*, 420 U.S. 636, 638 n. 2, 95 S.Ct. 1225, 1228 n. 2, 43 L.Ed.2d 514 (1975); *Bolling v. Sharpe*, 347 U.S. 497, 74 S.Ct. 693, 98 L.Ed. 884 (1954).

In 1996, the Supreme Court struck down as violative of the Equal Protection Clause a state constitutional amendment categorically prohibiting gay men and lesbians from obtaining state or local legal protection from discrimination based on their sexual orientation. *Romer v. Evans*, —— U.S. ——, 116 S.Ct. 1620, 134 L.Ed.2d 855 (1996). That case established that government discrimination against homosexuals in and of itself violates the constitutional guarantee of equal protection. *Id.* at ———— ——, 116 S.Ct. at 1628–29. Implicit in this holding is a determination that such discrimination, without more, is either inherently irrational or invidious. *Id.* at ——, 116 S.Ct. at 1627.

The Act admittedly treats heterosexuals and homosexuals differently, and the issue is whether that different treatment deprives homosexuals of their equal protection rights.

## III.

To put the case in context it is useful to consider some history of the treatment of gay men and lesbians over the centuries.

### A.

During the Holocaust, the Nazis persecuted homosexuals along with Jews, gypsies, and other groups, using the pink triangle as the symbol to designate homosexuals. *See* Kenji Yoshino, Suspect Symbols: The Literary Argument for Heightened Scrutiny for Gays, 96 *Colum. L.Rev.* 1753 (1996). But such prejudice has not always been and is not now shared in large portions of the world.

In a detailed and scholarly study of the history of social tolerance of homosexuality, Professor John Boswell found that the Greeks and Romans of antiquity rarely distinguished between homosexual and heterosexual activity or categorized persons on the basis of their sexual preference. John Boswell, *Christianity, Social Tolerance and Homosexuality* 58–59 (1980); *see also* Nan D. Hunter, Life After Hardwick, 27 *Harv. C.R.-C.L. L.Rev.* 531, 537 (1992) ("[I]t never occurred to pre-modern cultures to ascribe a person's sexual tastes to some positive, structural, or constitutive feature of his or her personality.") (quoting David Halperin, *One Hundred Years of Homosexuality* 27 (1990)).

The Ancient Greeks considered homosexual desire to be "ubiquitous and entirely ordinary." Boswell, *supra*, at 49. Similarly, "Roman society, at least in its urban centers, did not for the most part distinguish gay people from others and regarded homosexual interest and practice as an ordinary part of the range of human eroticism." *Id.* at 333. Gay people were fully integrated into Roman culture, and "neither they nor their contemporaries regarded their inclinations as harmful, bizarre, immoral, or threatening." *Id.* at 87. Consistent with this atmosphere of tolerance, the early Christian Church did not "oppose[ ] homosexual behavior *per se*." *Id.* at 333.

Visible hostility toward homosexuality did not appear in the West until the third century and lasted through the sixth century— during the period of the dissolution of the Roman state. *Id.* During the Early Middle Ages, neither gay people nor opposition to homosexuality were particularly evident in western Europe. *Id.* Until the twelfth century, moral theology was basically indifferent to homosexuality, and legal sanctions for homosexual acts were "very rare and of dubious efficacy." *Id.* at 333–34. During the eleventh century, gays rose to prominence and "[o]pposition to gay sexuality appeared rarely and more as aesthetic partisanship than as moral censure." *Id.* at 334. Medieval China and Japan were also tolerant of homosexual activity, at least involving men. *See* Richard A. Posner, *Sex and Reason* 68–69 (1992).

In modern times tolerance of homosexuality has been widespread. "It is common knowledge that in this century homosexuals have risen high in our own public service— both in Congress and in the Executive Branch—and have served with distinction." *Boutilier v. I.N.S.*, 387 U.S. 118, 129, 87 S.Ct. 1563, 1569, 18 L.Ed.2d 661 (1967) (Douglas, J., dissenting). A 1951 survey of seventy-six societies other than that of the United States shows that in forty-nine homosexual activities were considered "normal and socially acceptable." Clellan S. Ford & Frank A. Beach, *Patterns of Sexual Behavior* 130–31 (1951).

Many nations and all but twenty-two of the United States have decriminalized noncoercive sexual acts, such as heterosexual sodomy and homosexual activity. Posner, *supra*, at 56. Many states and localities have enacted legislation prohibiting discrimination in employment and in the provision of goods and services based on sexual orientation. *See* Development in the Law—Statutory Protection for Gays and Lesbians in Private Employment, 109 *Harv. L.Rev.* 1625 (1996).

Recent public opinion polls reflect the increasing social tolerance of homosexuality in this country. *See, e.g.,* United States General Accounting Office, Defense Force Management, *DOD's Policy on Homosexuality,* Report to Congressional Requesters, GAO/NSIAD–92–98, June, 1992, Ex. PX–5, at 39–40. Two national polls found that a majority of Americans support the admission to the Armed Forces of gay men and lesbians. A March 1991 Gallup Poll found that 69% of respondents believed that homosexuals should be admitted to the armed forces; and a national poll conducted by Penn and Schoen Associates in April 1991 found that 81% of Americans believed that homosexuals should not be discharged from military service solely because of their sexual orientation. *See id.*

Many countries prohibit discrimination against homosexuals. *See, e.g.,* Posner, *supra*, at 56–58, 161–73. Countries as diverse as the Republic of Korea, Canada, Sweden, Israel, and Germany all permit homosexuals to serve in their militaries. *See* United States General Accounting Office, *Homosexuals in the Military: Policies and Practices*

*of Foreign Countries,* Report to Senator John W. Warner, GAO/NSIAD–93–215, June, 1993, Ex. PX–7, at 5. Military officials in the latter four countries reported that "the presence of homosexuals in the military is not an issue and has not created problems in the functioning of military units" or "adversely affected unit readiness, effectiveness, cohesion, or morale." *Id.* at 3, 10.

### B.

While social and political tolerance of homosexuality is increasing, gay men and lesbians have endured a long history of discrimination, both official and private. Beginning in the second half of the twelfth century "virulent hostility appeared in popular literature and eventually spread to theological and legal writings as well." Boswell, *supra,* at 334. The first ecumenical council to rule on homosexual acts—Lateran III in 1179—required all laymen found to have committed homosexual acts to "suffer excommunication and be cast out from the community of the faithful." *Id.* at 277. By the later Middle Ages, homosexuality became more and more associated with heresy. *Id.* at 284.

The "earliest and most drastic legislation against gay people enacted by any government of the High Middle Ages" were laws passed by the European conquerors of Jerusalem imposing death by burning on homosexual men. *Id.* at 281. Between 1500 and 1800 communities of homosexuals were persecuted throughout Western Europe. *See* William N. Eskridge, Jr., The Social Constructionist Critique of Posner's Sex and Reason: Steps Toward a Gay Legal Agenda, 102 *Yale L.J.* 333, 370 (1992).

The Nazi persecution of homosexuals noted above was the most extreme manifestation in modern times of the prejudice against homosexuals. But in our country, homosexuals have been excluded from various government jobs, from many public benefits, and from immigration and naturalization. *See, e.g.,* William N. Eskridge, Privacy Jurisprudence and the Apartheid of the Closet, 1946–61, 24 *Fla. St. U.L.Rev.* 703 (1997); Harris M. Miller II, Note, An Argument for the Application of Equal Protection Heightened Scrutiny to Classifications Based on Homosexuality, 57 *S. Cal. L.Rev.* 797, 803–807, 824–25 (1984); J. D'Emilio, *Sexual Politics. Sexual Communities: The Making of a Homosexual Minority in the United States 1940–1970* (1983). Members of their own communities and even public officials have frequently vilified them. *See, e.g., Gay American History: Lesbians and Gay Men in the United States* 11–128 (Jonathan N. Katz, ed.1992).

A study commissioned by the National Institute of Justice found that gay men and lesbians "are probably the most frequent victims" of hate crimes. *See* Kendall Thomas, Beyond the Privacy Principle, 92 *Colum. L.Rev.* 1431, 1464 (1992)(quoting Peter Finn & Taylor McNeil, *The Response of the Criminal Justice System to Bias Crime: An Exploratory Review* 2 (1987)). Congress recognized the problem of hate crimes against gay men and lesbians when it included sexual orientation among the bases for pernicious hate crimes to be reported under Hate Crime Statistics Act, Pub.L. No. 101–275, Apr. 23, 1990, 104 Stat. 140 (codified at 28 U.S.C. § 534 note).

Of the hate crimes reported voluntarily by law enforcement officials in 1994, twelve percent were based on the victim's sexual orientation. *See, e.g.,* Congressional statement of Charles W. Archer, Assistant Director, Criminal Justice Information Division of the Federal Bureau of Investigation, Mar. 19, 1996, 1996 WL 7136929. The results were higher in some states. *See, e.g.,* Aurelio Rojas, State's Tolerant Image Tarnished, *S.F. Chron.,* Jul. 8, 1996, at A1 (18% of hate crimes reported in California related to sexual orientation. Abuse of gay men and lesbians occurs even in the Armed Forces. *See* S.Rep. No. 103–112, 103d Cong., 1st Sess., Ex. JX–15, at 289 (1993) [hereinafter S.Rep. No. 103–112] (noting the existence of such abuse and condemning it). Attacks against gays have been especially violent and brutal. *See* Yoshino, *supra,* at 1824–25.

Gay men and lesbians have also been victims of police harassment. *See, e.g.,* Eskridge, Privacy, *supra,* at 710–33, 753–58, 761–62 (1997). The well-known gay riot occurring at the Stonewall Inn in New York City in June, 1969 followed a routine police raid of

establishments frequented by gay men and lesbians. *See, e.g.,* Urvashi Vaid, *Virtual Equality* 54–55 (1996); Martin Duberman, *Stonewall* (1993).

## IV.

In the United States military establishment from the early 1920s through the 1970s the regulations treated homosexuals as unfit for service because they had a "personality disorder" or a "mental illness." Policy Concerning Homosexuality in the Armed Forces: Hearings Before the Senate Comm. on Armed Services, S. Hrg. No. 103–845, 103d Cong., 2d Sess. (1993) [hereinafter S. Hrg. No. 103–845], Ex. JX–1, vol. 1, at 13–14 (statement of Dr. David F. Burrelli). In 1982 the Department of Defense adopted a policy of mandating dismissal of homosexuals in order, among other things, to "ensure the integrity of the system of rank and command" and "prevent breaches of security." *Id.* at 15.

As late as 1993 some military advocates urged retention of an outright ban on admission of homosexuals because they could not be trusted and were "far more likely" to "spread" infectious diseases. Policy Implications of Lifting the Ban on Homosexuals in the Military: Hearings Before the House Comm. on Armed Services, H.A.S.C. No. 103–18, 103d Cong., 1st *Sess.* (1993) [hereinafter H.A.S.C. No. 103–18], Ex. JX–2, at 89–90 (statement of Col. John Ripley).

The government has now abandoned any such contentions. The legislative record shows that the Act and the Directives adopted under it are not premised on the prior beliefs. The government says that Congress "clarified that the proscription on service has nothing to do with unjustified assumptions that homosexuals are not just as capable physically, mentally and psychologically to serve in the United States military as heterosexuals." Transcript of Government's Closing Statement, Nov. 18, 1996, at 256.

The government agrees also that homosexuals are no more likely than heterosexuals to violate the military code of conduct or other rules generally. Defendants' Responses to Plaintiffs' Requests for Admission, Ex. PX–13, at 5–8.

Many high ranking officers vouched for the ability of homosexuals to serve honorably, conscientiously, and competently. For example, General Colin Powell referred to them as "proud, brave, loyal, good Americans," 1993 Defense Budget House Hearing, 102d Cong., at 45 (1993), and said they had "served well in the past and are continuing to serve well." S. Hrg. No. 103–845, Ex. JX–1, vol. 3, at 707. General Norman Schwartzkopf echoed these views, stating that "homosexuals have served in the past and have done a great job serving their country." S. Hrg. No. 103–845, Ex. JX–1, vol. 2, at 612.

Those sentiments have been confirmed by the fact that over the years thousands of homosexuals have served in the armed services ably and honorably.

## V.

The Act applies exclusively to homosexuals. But military law proscribes a broad range of sexual conduct without regard to the actor's sexual orientation.

Article 125 of the Uniform Code of Military Justice (the Military Code) makes it a punishable offense for "any person" to engage in "sodomy," defined as "unnatural carnal copulation with another person of the same or opposite sex or with an animal." 10 U.S.C. § 925(a). Since this prohibition applies to both heterosexuals and homosexuals, plaintiffs do not, and could not, argue that it, or any other provision applicable to heterosexuals and homosexuals alike, violates their equal protection rights.

The maximum military punishment for sodomy is not light. The Military Code makes it punishable by, in addition to a dishonorable discharge and forfeiture of all pay and allowances, ten years "confinement at hard labor" if done by force and without consent, twenty such years if done with a child under 16, and in all other cases five such years.

Sodomy includes both anal sex, *see United States v. Hall,* 34 M.J. 695 (A.C.M.R.1991), *set aside on other grounds,* 36 M.J. 80 (C.M.A.1992), and oral sex, *see United States v. Henderson,* 34 M.J. 174 (C.M.A.1992);

*United States v. Gates*, 40 M.J. 354, 355 (C.M.A.1994) (upholding conviction for private, nonadulterous, non-commercial consensual, heterosexual fellatio).

Article 120 of the Military Code, entitled Rape and Carnal Knowledge, provides that "any person" subject to the code "who commits an act of sexual intercourse, by force and without consent, is guilty of rape and shall be punished by death or such other punishment as a court-martial may direct." Prior to 1992 this article provided for punishment of, among others, a person who commits an act of sexual intercourse "with a female not his wife, by force and without her consent." In 1992 Congress amended the article to strike the words "with a female not his wife" and "her." Since 1992 a person who rapes a man or a woman by sodomizing him or her can be punished by death.

Article 133, applicable to both men and women, provides for punishment of a commissioned officer, cadet, or midshipmen for "conduct unbecoming an officer and a gentleman" or gentlewoman. See *United States v. Parrillo*, 31 M.J. 886 (A.F.C.M.R.1990), *aff'd*, 34 M.J. 112 (C.M.A.1992). This article covers sexual misconduct, including not merely adultery, *see, e.g., United States v. Czekala*, 38 M.J. 566 (A.C.M.R.1993), *aff'd*, 42 M.J. 168 (C.M.A.), *cert. denied*, —— U.S. ——, 116 S.Ct. 403, 133 L.Ed.2d 322 (1995), but fraternization, *see, e.g. United States v. Boyett*, 37 M.J. 872 (A.F.C.M.R.1993), *aff'd*, 42 M.J. 150 (C.M.A.), *cert. denied*, —— U.S. ——, 116 S.Ct. 308, 133 L.Ed.2d 212 (1995).

Under Article 134, the "General Article," both homosexual and heterosexual service members may be prosecuted for "all disorders and neglects to the prejudice of good order and discipline in the armed forces." The Manual for Courts–Martial recites that this article applies to, among other things, indecent assault, *Manual for Courts–Martial* IV–95 (1995), fraternization, *id.* at IV–107, and indecent acts with another, *id.* at IV–109–10. The cases have held the article applicable to punish window peeping, *United States v. Foster*, 13 M.J. 789 (A.C.M.R.1982), indecent exposure, *United States v. Choate*, 32 M.J. 423 (C.M.A.1991), knowing possession of child pornography, *United States v.*

*Pullen*, 41 M.J. 886 (A.F.Ct.Crim.App.1995), and "lewd and lascivious acts." *United States v. Johnson*, 14 M.J. 1029 (A.C.M.R. 1982), *aff'd*, 17 M.J. 251 (C.M.A.1984) (approaching and kissing a colleague on the neck).

Fraternization, meaning personal or intimate relationships "that contravene the customary bounds of acceptable senior-subordinate relationships" and "improper relationships and social interactions between officer members as well as between enlisted members," Department of the Navy, OPNAV Instruction No. 5370.2A, § 4(b) (Mar. 14, 1994), is also prohibited to both heterosexuals and homosexuals under departmental regulations. *See, e.g., id.* § 4(c); *Marine Corps Manual* 1100.4.

Article 93 provides for punishment of "[a]ny person" subject to the code who is guilty of "cruelty toward, or oppression or maltreatment of, any person subject to his orders." This article applies where, regardless of the intent of the accused, the maltreatment, "viewed objectively, results in physical or mental pain or suffering and is abusive or otherwise unwarranted, unjustified or unnecessary for any lawful purpose." *United States v. Hanson*, 30 M.J. 1198 (A.F.C.M.R.1990), *aff'd*, 32 M.J. 309 (C.M.A.), *cert. denied*, 500 U.S. 933, 111 S.Ct. 2054, 114 L.Ed.2d 460 (1991).

Moreover, "cruelty and maltreatment" include "[a]ssault, improper punishment, and sexual harassment." *Manual for Courts–Martial*, at IV–26. Sexual harassment is also prohibited by department regulations. *See, e.g.* General Regulations, U.S. Naval Regulations, 1990, Art. 1166 (as amended Jan. 1993); SECNAV Instruction No. 5300.26B (Jan. 6, 1993); Marine Corps Order No. 5300.10A (July 17, 1989).

## VI.

The provisions described above, applicable equally to homosexuals and heterosexuals, are not drawn into question by plaintiffs. They enable the Armed Forces to deter a whole gamut of sexual conduct from sodomy and rape to sexual harassment and lewd, lascivious, and reprehensible conduct, indeed

all sexual behavior likely to cause harm or embarrassment to someone else. In particular, the heavy criminal punishment for sodomy makes it plain that the Act was not adopted as a deterrent to that practice.

Given the admitted fact that homosexuals are no more likely than heterosexuals to violate provisions of the Military Code, *see* Defendants' Responses to Plaintiffs' Requests for Admission, at 8, Ex. PX–13 at 7, there was no need to add a further sanction as a deterrent to sexual misconduct, and the government does not argue otherwise. *Cf. United States Dep't of Agriculture v. Moreno,* 413 U.S. 528, 536, 93 S.Ct. 2821, 2826, 37 L.Ed.2d 782 (1973) (the presence of provisions to combat food stamp fraud "necessarily casts considerable doubt" that the denial of food stamps to persons living in households with unrelated members was intended to prevent the same abuses); *Eisenstadt v. Baird,* 405 U.S. 438, 452, 92 S.Ct. 1029, 1037, 31 L.Ed.2d 349 (1972) (statute prohibiting distribution of contraceptives to single persons held not designed to promote public health "in view of the federal and state laws *already* regulating the distribution of harmful drugs") (emphasis in original).

## VII.

The Act requires the discharge of a homosexual who has engaged in acts not otherwise punishable under the Military Code and in themselves inherently innocuous. By defining the term "homosexual act" to include physical contact "a reasonable person would understand to demonstrate a propensity or intent to engage in an act" with someone of the same sex for the purpose of satisfying sexual desires, the Act enables the Armed Forces to dismiss someone who, for example, kisses or holds hands off base and in private or has done so before entering the service. 32 C.F.R. Ch. 1, Pt. 4a, App. A, H. 1, c. No such sanction is imposed on a heterosexual who, with the same purpose, does the same thing with someone of a different sex. See *Able,* 88 F.3d at 1291 ("[T]here is no doubt that the Act treats homosexuals and heterosexuals differently even though they have engaged in similar acts within a broad range.")

It is hard to imagine why the mere holding of hands off base and in private is dangerous to the mission of the Armed Forces if done by a homosexual but not if done by a heterosexual. Given the government's concessions, the discriminatory prohibition against holding hands cannot have been designed as a prophylactic to reduce still further the chance that a homosexual will violate the military law prohibiting sodomy, rape, harassment, or lewd and lascivious behavior.

The obvious basis for defining "homosexual act" to include an act such as holding hands was not because the act is inherently dangerous but because of what the act says about the actor, namely, "I have a homosexual orientation."

## VIII.

The court is acutely aware of the deference owed to Congress' determinations in cases involving the military. *Rostker v. Goldberg,* 453 U.S. 57, 70, 101 S.Ct. 2646, 2655, 69 L.Ed.2d 478 (1981). In pursuit of its mission, "the military must foster instinctive obedience, unity, commitment, and esprit de corps," *Goldman v. Weinberger,* 475 U.S. 503, 507, 106 S.Ct. 1310, 1313, 89 L.Ed.2d 478 (1986), and "insist upon a respect for duty and a discipline without counterpart in civilian life." *Schlesinger v. Councilman,* 420 U.S. 738, 757, 95 S.Ct. 1300, 1312–13, 43 L.Ed.2d 591 (1975).

Congress' decisions regarding the military, though accorded great weight by the court, are not exempted from the constitutional imperative of equal protection. *Rostker,* 453 U.S. at 67, 101 S.Ct. at 2653; *see also Able,* 88 F.3d at 1293 ("Deference to Congress in military matters of course does not mean that Congress operates free of all constitutional restraint when legislating in this area.").

The court, in reconciling the deference due Congress and its own constitutional responsibility, does not change the substantive content of equal protection, *Rostker,* 453 U.S. at 69–70, 101 S.Ct. at 2654, but gives deference to the military judgment as to the importance of the military interest. *Goldman,* 475 U.S. at 507, 106 S.Ct. at 1313.

### IX.

In its latest presentation, the government proffers several justifications to support the differential treatment of homosexuals and heterosexuals prohibiting homosexuals from revealing their sexual orientation in any way, whether by word or deed. The government says that the Act helps foster unit cohesion, promotes the privacy of heterosexuals, and reduces sexual tensions.

The government does not justify its discrimination by reference to some defect in the performance of homosexuals, or claim that they represent a security risk as likely targets for blackmail, *see* Defense Personnel Security Research and Education Center, Nonconforming Sexual Orientation and Military Suitability, Dec. 1988, Ex. PX–12, at 27–32, or that they are apt to seduce heterosexuals. *See* S.Rep. No. 103–112, JX–15, at 279 (statement of General Powell).

Since there is nothing in the record to suggest any additional reason motivating the Act, the court examines the justifications offered here.

### A.

■ One of the government's theories is that the Act "furthers the vital military goal of unit cohesion." Unity in a fighting group is an important government interest, as was testified by Generals H. Norman Schwartzkopf and Colin Powell. S.Rep. No. 103–112, Ex. JX–15, at 274, 275. But that fact does not end the court's inquiry. *Mississippi Univ. for Women v. Hogan,* 458 U.S. 718, 724 n. 9, 102 S.Ct. 3331, 3336 n. 9, 73 L.Ed.2d 1090 (1982). The court must consider whether the Act seeks to further that interest in a legitimate way.

Other than the arguments as to privacy and sexual tension addressed below, the only explanation the government offers for the perceived "disruptive effect that the presence of members who engage in homosexual acts would have on other members of the unit" is that their presence would raise "concerns" of heterosexual service members "based on moral precepts and ethical values." Defendants' Reply to Plaintiffs' Post–Trial Brief, at 10. In other words, the known presence of homosexuals may disrupt the unit because heterosexual members may morally disapprove of homosexuals.

This is an outright confession that "unit cohesion" is a euphemism for catering to the prejudices of heterosexuals. There is overwhelming evidence in the record to support this confession.

The Report of the Association of the United States Army states: "Heterosexual animosity toward known homosexuals can cause latent or even overt hostility, resulting in degradation of team or unit esprit." H.A.S.C. 103–18, Ex. JX–2, at 337. And General H. Norman Schwartzkopf said that "the introduction of an open homosexual into a small unit immediately polarizes that unit.... For whatever reason, the organization is divided into a majority who oppose, a small minority who approve, and other groups who either do not care or wish the problem would go away." S. Hrg. No. 103–845, Ex. JX–1, at 595–96. General John P. Otjen, the chairman of the Military Working Group recommending the policy that became law, testified that "when somebody identifies themselves [sic] as homosexual" that is "disruptive to unit cohesion." S. Hrg. No. 103–845, Ex. JX–1, at 780; *see also* S.Rep. No. 103–112, Ex. JX–15, at 280 (testimony of Lieutenant General Calvin Wailer and of Command Master Chief David Borne).

The structure of the Act confirms these statements that it is predicated on the perceptions of heterosexuals. That the definition of a "homosexual act" includes bodily contacts a "reasonable person would understand" to show a "propensity" to engage in other homosexual acts, shows that the Act is aimed at those perceptions.

The opinion of Generals Powell and Schwartzkopf was that, while homosexuals were eligible to serve as "good Americans," they should remain only so long as they stay in the closet masquerading as heterosexuals because "open homosexuality" would arouse the animosity of heterosexuals. The minute they are seen off duty and off base holding hands with someone of the same sex they should be discharged.

Given the conceded ability of homosexuals to contribute effectively to their units, the only conceivable way that the presence of known homosexuals could undermine the cohesion of the unit is "by the negative reactions of service members who disapprove of homosexuality." *Philips v. Perry*, 106 F.3d 1420, 1435 (9th Cir.1997) (Fletcher, J., dissenting); *cf. City of Cleburne v. Cleburne Living Center*, 473 U.S. 432, 450, 105 S.Ct. 3249, 3260, 87 L.Ed.2d 313 (1985) (only discernable purpose for requiring permit for home for mentally retarded is "irrational prejudice").

The private prejudices of heterosexual service members are illegitimate reasons for government-sanctioned discrimination against gay and lesbian service members. See *Romer*, —— U.S. at ——, 116 S.Ct. at 1627. As the Supreme Court, in an opinion by Chief Justice Burger, admonished:

> The Constitution cannot control such prejudices but neither can it tolerate them. Private biases may be outside the reach of the law, but the law cannot, directly or indirectly, give them effect. 'Public officials sworn to uphold the Constitution may not avoid a constitutional duty by bowing to the hypothetical effects of private ... prejudice that they assume to be both widely and deeply held.'

*Palmore v. Sidoti*, 466 U.S. 429, 433, 104 S.Ct. 1879, 1882, 80 L.Ed.2d 421 (1984) (internal citation omitted); *see also Cleburne*, 473 U.S. at 448, 105 S.Ct. at 3258 ("[M]ere negative attitudes, or fear, unsubstantiated by factors which are properly cognizable in a zoning proceeding, are not permissible bases for treating a home for the mentally retarded differently from apartment houses, multiple dwellings, and the like.").

This principle applies here. As Judge Betty Fletcher explained:

> Just as the desire to accommodate other citizens' personal or religious objections to homosexuality did not suffice to uphold Amendment 2, *see Romer*, —— U.S. at ——, 116 S.Ct. at 1629, the desire to protect a child from the racial prejudices of others did not provide a legitimate reason for favoring a same-race couple over an interracial couple in awarding custody of a

child, *see Palmore*, 466 U.S. at 433, 104 S.Ct. at 1882, and the negative attitudes of property owners did not provide a legitimate justification for allowing rejection of a zoning permit for a home for mentally retarded individuals, *see Cleburne*, 473 U.S. at 448, 105 S.Ct. at 3258–59, the desire to accommodate the attitudes of heterosexual service members opposed to homosexuality does not provide a legitimate reason for excluding gay men and lesbians from the military.

*Philips*, 106 F.3d at 1436 (Fletcher, J., dissenting).

The fact that the prejudice arises in the military context does not legitimate the discrimination. The Constitution does not grant the military special license to act on prejudices or cater to them.

But aside from the foregoing considerations, it is incongruous to assume that the imposition of silence on homosexuals will have a beneficial effect on maintaining "cohesion." It is unlikely in the extreme that any enlisted member fit to serve would believe that closeted homosexuals are not serving or would long retain that belief after asking another enlisted member his or her sexual orientation and receiving the reply "no comment." *See* S. Hrg. No. 103–845, Ex. JX–1, vol. 3, at 810–11 (testimony that an enlisted service member may ask that question).

The generals announced that heterosexuals had animosity towards homosexuals, but they never announced a military judgment that, after the passage of the Act, any heterosexuals, let alone a large number, would be fooled into supposing all of their fellow members were heterosexuals. To the extent that some heterosexuals abhor homosexuals they will be suspicious of and uneasy with all their fellows in the unit because each might be a secret homosexual—hardly a prescription for "unit cohesion." No doubt these heterosexuals would be content if all homosexuals were barred from the service. That is a choice Congress rejected.

### B.

The government says that the Act is justified as tending to protect the "privacy

interests" of heterosexuals and reduce "sexual tensions" among service members.

The Armed Services requires members to live for prolonged periods with minimal privacy and in close quarters with other members. Members "are subject to involuntary assignment to units, duties, and quarters that require working and living in close proximity with others under conditions that allow little or no privacy." Executive Summary on Privacy in the Military, July 2, 1993, Ex. DX–10, at 2.

One government document identifies four differences between military and civilian life that affect privacy: (1) "the loss of many basic personal freedoms for the sake of the military mission," (2) "the inability of the service member to control the conditions and setting for service," (3) "physical limitations of work and living spaces, which are often one and the same," and (4) "forced close intimacy with persons not of one's own choosing for relatively long periods of time." *Id.* at 3.

The government argues that the presence of homosexuals who have kept their sexual orientation a secret somehow threatens this vestigial privacy interest. This argument is that (1) heterosexual service members feel their privacy is diminished once they are aware homosexuals are amongst them and may possibly act on their sexual orientation, and (2) a homosexual will increase "sexual tensions" among the members.

The argument as to privacy is without substantial merit. It assumes that, provided homosexuals stay in the closet, heterosexuals will believe there are no homosexuals present in their unit. In fact homosexuals are present and are entitled to be present. They are allowed to use the same bunkrooms and bathrooms. As the government says, it would be impossible to segregate such facilities by sexual orientation. Even if homosexuals keep their orientation a secret, no rational person would be deceived into believing that the facilities are heterosexual only. Given the admission that homosexuals are no more likely than heterosexuals to violate the military's sexual misconduct rules, the Act's discrimination against homosexuals is not rationally related to "privacy."

Moreover, as the record shows, it is the dislike of heterosexuals, and not any misconduct on the part of homosexuals, that is the government's concern for "privacy." *See* S.Rep. No. 103–112, Ex. JX–15, at 281 (statement of Major Kathleen Bergeron) ("I do not believe that any amount of sensitivity training or reeducation will change the way Marines think or feel about homosexual behavior."); *id.* at 283 (Statement of General Powell) ("heterosexuals ... prefer not to have somebody of the same sex find them sexually attractive"); *see also* Executive Summary on Privacy in the Military, July 2, 1993 ("Most heterosexual servicemembers would object to being forced into close quarters with known homosexuals."). According to the military the violation of privacy "does not depend upon the homosexual acting out his sexual attraction towards others," and "the mere presence of an avowed homosexual in a berthing area violates the privacy of heterosexuals." *Id.*

As previously stated, the subjective discomfort, prejudices, and fears of heterosexuals is not a legitimate justification for discrimination against gay men and lesbians. *Romer v. Evans,* —— U.S. at ——, 116 S.Ct. at 1627, makes it clear that the Equal Protection Clause prohibits the government from discriminating against one group in order to accommodate the prejudices of another. *See also Cleburne v. Cleburne Living Center,* 473 U.S. at 448, 105 S.Ct. at 3258; *Palmore v. Sidoti,* 466 U.S. at 433, 104 S.Ct. at 1882.

The government's argument as to sexual tensions is that both heterosexuals and homosexuals are "likely to act in accordance with their sexual drives," that the temptations of heterosexuals is reduced because the military provides separate accommodations for males and females, and that it is impossible to provide accommodations based on sexual orientation.

That might be an argument, though a weak one, for a policy of excluding all homosexuals from the Armed Forces, a policy Congress refused to adopt. But it is no argument for imposing secrecy on homosexuals. The government does not suggest any reason why an open homosexual will because

of that openness be more likely to succumb to these temptations and violate the Military Code.

Moreover, the military regulations do not even address the opportunities for sexual tension among heterosexuals unless there is misbehavior. Indeed, a sexual relationship between a male officer and female enlisted member not under his supervision is not even punished where the conduct is not "prejudicial to good order and discipline or of a nature to discredit the armed forces." *United States v. Johanns*, 20 M.J. 155 (C.M.A.), *cert. denied*, 474 U.S. 850, 106 S.Ct. 147, 88 L.Ed.2d 122 (1985).

The illogic of the arguments based on privacy and sexual tension further reveals the purpose of the Act to acquiesce in, indeed encourage, the animosity of some heterosexuals towards homosexuals in the vain hope those heterosexuals are misled into believing no homosexuals are serving with them.

### X.

A court should ask itself what it might be like to be a homosexual. *See* Yoshino, *supra*, at 1834. For the United States government to require those self-identifying as homosexuals to hide their orientation and to pretend to be heterosexuals is to ask them to accept a judgment that their orientation is in itself disgraceful and they are unfit to serve. To impose such a degrading and deplorable condition for remaining in the Armed Services cannot in fairness be justified on the ground that the truth might arouse the prejudice of some of their fellow members.

The plaintiffs are American citizens. They wish to serve their country in positions of responsibility and potential danger. This country includes people of many different kinds and beliefs. But as Chief Justice Marshall said in a different context, "we are one people." *Cohens v. Virginia*, 19 U.S. (6 Wheat.) 264, 412, 5 L.Ed. 257 (1821). Americans are one people both in war and in peace. *Id.* It is not within our constitutional tradition for our government to designate members of one societal group as pariahs. *Romer v. Evans*, —— U.S. ——, ——, 116 S.Ct. 1620, 1628, 134 L.Ed.2d 855 (1996).

### XI.

█ In considering whether legislation does or does not give equal protection, the court looks at what end the legislation seeks, whether that end is furthered by the classification adopted, and its effect on the persons adversely affected by the Act. Because "most legislation classifies for one purpose or another," the Supreme Court has held that "if a law neither burdens a fundamental right nor targets a suspect class," the legislative classification should be upheld but only provided "it bears a rational relation to some legitimate end." *Romer*, —— U.S. at ——, 116 S.Ct. at 1627 (1996).

Ordinarily, it would be illegitimate to punish an act harmless in itself, such as holding hands, merely because it serves to announce something that excites the animosity of others. *Cf., e.g., Simon & Schuster, Inc. v. New York Crime Victims Bd.*, 502 U.S. 105, 118, 112 S.Ct. 501, 509, 116 L.Ed.2d 476 (1991); *Texas v. Johnson*, 491 U.S. 397, 414, 109 S.Ct. 2533, 2545, 105 L.Ed.2d 342 (1989); *Healy v. James*, 408 U.S. 169, 187–88, 92 S.Ct. 2338, 2349, 33 L.Ed.2d 266 (1972); *Terminiello v. Chicago*, 337 U.S. 1, 4, 69 S.Ct. 894, 896, 93 L.Ed. 1131 (1949). "[I]f the constitutional conception of 'equal protection of the laws' means anything, it must at the very least mean that a bare desire to harm a politically unpopular group cannot constitute a legitimate government interest." *United States Dep't of Agriculture v. Moreno*, 413 U.S. 528, 534–35, 93 S.Ct. 2821, 2826, 37 L.Ed.2d 782 (1973); *see also Plyler v. Doe*, 457 U.S. 202, 216 n. 14, 218–19, 102 S.Ct. 2382, 2395 n. 14, 2395–96, 72 L.Ed.2d 786 (1982). The legislative end sought must be independent of the discrimination that the equal protection clause is meant to prevent. *Loving v. Commonwealth of Virginia*, 388 U.S. 1, 11, 87 S.Ct. 1817, 1823, 18 L.Ed.2d 1010 (1967).

In addition, equal protection prohibits the government from indiscriminately imposing inequalities based on naked stereotypes. *See, e.g., United States v. Virginia*, —— U.S. ——, ——, 116 S.Ct. 2264, 2275, 135 L.Ed.2d 735 (1996); *Mississippi Univ. for Women v. Hogan*, 458 U.S. 718, 725, 102 S.Ct. 3331,

3336, 73 L.Ed.2d 1090 (1982); *Reed v. Reed,* 404 U.S. 71, 75–76, 92 S.Ct. 251, 253–54, 30 L.Ed.2d 225 (1971).

In this case, for reasons already stated, it is clear that the Act discriminates against homosexuals in order to cater to the prejudices of heterosexuals. But when a statute is not so clearly based on prejudice, the court considers whether the basis for the discrimination is likely to reflect irrational prejudice or a desire to disadvantage an unpopular group. Factors such as race, alienage, and national origin, for instance, "are so seldom relevant to the achievement of any legitimate state interest that laws grounded in such considerations are deemed to reflect prejudice and antipathy—a view that those in the burdened classes are not as worthy or deserving as others." *City of Cleburne v. Cleburne Living Center,* 473 U.S. 432, 440, 105 S.Ct. 3249, 3254, 87 L.Ed.2d 313 (1985). Such laws are "incompatible with the constitutional understanding that each person is to be judged individually and is entitled to equal justice under the law." *Plyler v. Doe,* 457 U.S. 202, 216 n. 14, 102 S.Ct. 2382, 2394 n. 14, 72 L.Ed.2d 786 (1982).

Where a class of persons has been saddled with disabilities, or subjected to a history of purposeful unequal treatment, or relegated to a position of political powerlessness, it may "command extraordinary protection from the majoritarian political process." *San Antonio Indep. Sch. Dist. v. Rodriguez,* 411 U.S. 1, 28, 93 S.Ct. 1278, 1294, 36 L.Ed.2d 16 (1973). In addition to instances where members of the group defined by the classification have been subject to discrimination, exhibit obvious, immutable, or distinguishing characteristics that define them as a discrete group, and constitute a minority or lack political power, *Bowen v. Gilliard,* 483 U.S. 587, 602, 107 S.Ct. 3008, 3018, 97 L.Ed.2d 485 (1987) (quoting *Lyng v. Castillo,* 477 U.S. 635, 638, 106 S.Ct. 2727, 2729, 91 L.Ed.2d 527 (1986)), the court considers whether the trait which defines the group "frequently bears no relation to ability to perform or contribute to society," and the laws discriminating against the group are subject to what is called heightened scrutiny.

*Frontiero v. Richardson,* 411 U.S. 677, 686, 93 S.Ct. 1764, 1770, 36 L.Ed.2d 583 (1973).

Neither the Supreme Court nor the Second Circuit has decided whether or not laws that are not overtly based on irrational prejudice but discriminate against gay men and lesbians warrant what is called heightened scrutiny. The Supreme Court declined to reach that question in *Romer v. Evans,* finding that the law in that case discriminating against homosexuals could not withstand the most minimal scrutiny. *Romer,* —— U.S. at ——, 116 S.Ct. at 1627. Nor did the Second Circuit reach the issue in *Falk v. Secretary of the Army,* 870 F.2d 941 (2d Cir.1989), although it suggested that discrimination based on sexual orientation "may be constitutionally infirm." *Id.* at 947.

Given the concessions by the government and the provisions of the Military Code, there can be no doubt that the purpose of the Act is to foster or at least acquiesce in the prejudice of some heterosexuals. Hence in this case there is no need to infer from a history of discrimination against homosexuals that such prejudice exists in the Armed Forces. That prejudice was frankly announced in the congressional hearings.

But the bleak history of discrimination against homosexuals in this country and elsewhere would in itself be sufficient to justify such an inference. As Justice Brennan said, "homosexuals have historically been the object of pernicious and sustained hostility, and it is fair to say that discrimination against homosexuals is 'likely ... to reflect deepseated prejudice rather than ... rationality.'" *Rowland v. Mad River Local Sch. Dist.,* 470 U.S. 1009, 1014, 105 S.Ct. 1373, 1377, 84 L.Ed.2d 392 (1985) (Brennan, J., dissenting from denial of writ of certiorari) (internal citations omitted). The Senate Committee on Armed Services also recognized that "there is prejudice based upon stereotypes against gays and lesbians in American society." Sen. Rep. No. 103–112, Ex. JX–15, at 282.

This history suggests that laws imposing disabilities on gay men and lesbians are based on prejudice. *Cf., e.g., Frontiero v. Richardson,* 411 U.S. 677, 683, 93 S.Ct. 1764, 1769, 36 L.Ed.2d 583 (1973) (noting that "our

Nation has had a long and unfortunate history of sex discrimination"); *see also United States v. Virginia,* —— U.S. ——, —— —— ——, 116 S.Ct. 2264, 2274–75, 135 L.Ed.2d 735 (1996) (same); *J.E.B. v. Alabama ex rel. T.B.,* 511 U.S. 127, 136, 114 S.Ct. 1419, 1425, 128 L.Ed.2d 89 (1994) (same).

Moreover, "[b]ecause of the immediate and severe opprobrium often manifested against homosexuals or one so identified publicly, members of this group are particularly powerless to pursue their rights openly in the public arena." *Rowland,* 470 U.S. at 1014, 105 S.Ct. at 1377 (Brennan, J., dissenting from denial of writ of certiorari); *see* Eve Kosofsky Sedgwick, *Epistemology of the Closet* 71 (1990) ("The closet is the defining structure for gay oppression in this century."). Even though homosexuals in some communities have successfully convinced local governments to adopt legislation prohibiting discrimination based on sexual orientation, Colorado's adoption of Amendment 2, denying homosexuals "the safeguards that others enjoy or may seek without constraint," *Romer,* —— U.S. at ——, 116 S.Ct. at 1627, is but one example that local political successes do not translate into a broader ability of homosexuals to protect themselves.

Laws discriminating against gay men and lesbians affect a small but significant portion of the population. *See, e.g.,* Posner, *supra,* at 295 (most estimates of the percentage of homosexual men in the population range from 2 to 5 percent; estimates of women are lower); Robert T. Michael, *Sex in America* 174–77 (1994) (study finding that 6 percent of men and 4 percent of women were attracted to members of the same sex and about 2 percent of both men and women had acted on such attraction during the previous year); Alfred A. Kinsey et al., *Sexual Behavior in the Human Female* 474–75 (1953); Alfred A. Kinsey et al., *Sexual Behavior in the Human Male* 650–51 (1948). While public censure and discrimination may prevent many gay men and lesbians from revealing their sexual identities, their same-sex sexual orientation is a sufficiently "distinguishing characteristic" to "define them as a discrete group." *Bowen v. Gilliard,* 483 U.S. 587, 602, 107 S.Ct. 3008, 3018, 97 L.Ed.2d 485 (1987).

Some courts have treated the immutability of the trait defining the group as a prerequisite to heightened protection. *See, e.g., High Tech Gays v. Defense Indus. Security Clearance Office,* 895 F.2d 563, 573 (9th Cir. 1990) (heightened scrutiny not appropriate because "[h]omosexuality is not an immutable characteristic"); *Woodward v. United States,* 871 F.2d 1068, 1076 (Fed.Cir.1989), *cert. denied,* 494 U.S. 1003, 110 S.Ct. 1295, 108 L.Ed.2d 473 (1990) (homosexuality is "primarily behavioral in nature" and not immutable).

But the Supreme Court has never held that only classes with immutable traits are entitled to such protection. *See Cleburne,* 473 U.S. at 443 n. 10, 105 S.Ct. at 3256 n. 10; *see also Watkins v. United States Army,* 875 F.2d 699, 725 (9th Cir.1989) (Norris, J., concurring) (citing cases), *cert. denied,* 498 U.S. 957, 111 S.Ct. 384, 112 L.Ed.2d 395 (1990). Immutability is merely one of several possible indications that a classification is likely to reflect prejudice. Indeed, though alienage is not immutable, aliens are accorded heightened scrutiny. *See, e.g., Graham v. Richardson,* 403 U.S. 365, 91 S.Ct. 1848, 29 L.Ed.2d 534 (1971).

In any event, the causes of sexual orientation are still in dispute. *See, e.g.,* Nan Hunter, Life After *Hardwick,* 27 *Harv. C.R.-C.L. L.Rev.* 531, 549 (1992). There is evidence that sexual preference is for some immutable. *See* Posner, *supra,* at 101 (citing studies showing a genetic basis for sexual orientation); Janet E. Halley, The Politics of the Closet: Towards Equal Protection for Gay, Lesbian, and Bisexual Identity, 36 *U.C.L.A. L.Rev.* 915, 937–46 (1989) (some studies showing that sexual orientation is formed in childhood and others showing that homosexuality is sometimes immutable and sometimes not). But the constitutionality of a classification should not turn on the present state of scientific knowledge.

Whether or not sexual orientation is immutable, it forms a significant part of a person's identity. *Cf. Paris Adult Theatre I v. Slaton,* 413 U.S. 49, 63, 93 S.Ct. 2628, 2638, 37 L.Ed.2d 446 (1973) (sexual intimacy is "a sensitive, key relationship of human existence, central to," among other things, "the

development of human personality"). Same-sex sexual orientation persists in all societies and has proven to be almost completely resistant to change or "treatment," despite widespread discrimination and social pressure against homosexuals. *See, e.g.,* Posner, *supra,* at 296.

For the reasons already stated it is clear from the legislative history and the language and structure of the Act that it is based on irrational prejudice. Were the court required to draw an inference of such prejudice from the past treatment of homosexuals the court would do so. Homosexuals meet the criteria of a group warranting heightened protection under the equal protection clause. The prejudice against them "tends seriously to curtail the operation of those political processes ordinarily to be relied upon to protect minorities." *United States v. Carolene Products Co.,* 304 U.S. 144, 152 n. 4, 58 S.Ct. 778, 783 n. 4, 82 L.Ed. 1234 (1938); *see* John Hart Ely, *Democracy and Distrust* (1980). Their sexual orientation admittedly "bears no relation" to their "ability to perform or contribute to" the Armed Forces. *Frontiero,* 411 U.S. at 686, 93 S.Ct. at 1770.

## XII.

This case involves neither a due process challenge nor a classification based on sodomy. This is therefore not the occasion to consider whether *Romer v. Evans, supra,* foreshadows the overruling of the five-to-four decision in *Bowers v. Hardwick,* 478 U.S. 186, 190, 106 S.Ct. 2841, 2843, 92 L.Ed.2d 140 (1986), holding that the Due Process Clause does not "confer a fundamental right" to engage in sodomy.

Sodomy, defined by the Uniform Code of Military Justice as oral or anal sex, defines the class of homosexuals no more than it does the class of heterosexuals. Studies of sexual behavior indicate that a large number of heterosexuals engage in oral and/or anal sex. *See, e.g.,* Robert T. Michael et al., *Sex in America* 139–41 (1994) (finding that 73% of women had engaged in passive and 68% in active oral sex at some time in their lives; that 79% of men had engaged in passive and 77% in active oral sex at some time in their lives; and that about a quarter of American

men had engaged in anal sex); P. Blumenstein & P. Schwartz, *American Couples* 236, 242 (1981). What differentiates the class of homosexuals from that of heterosexuals is the gender of the person's sexual partner.

The United States has not decided that it is evil to have a homosexual orientation. On the contrary, Congress has determined that homosexuality does not disqualify someone from serving in the Armed Forces. The Act conditions that service on a homosexual's keeping that orientation a secret. It is the very fact that there is bias among heterosexuals in the Armed Forces that led to the Act's requirement that homosexuals remain in the closet.

## XIII.

In his order desegregating the Armed Forces, President Harry S. Truman said, "it is essential that there be maintained in the armed services of the United States the highest standards of democracy, with equality of treatment and opportunity for all those who serve in our country's defense." Exec. Ord. 9981, 3 C.F.R. Supp.1947, at 722 (July 29, 1948). This is no less true in this case.

For the Act to single out gay and lesbian service members denies them, without legitimate reason, the right openly to participate as equals in the defense of the nation and imposes "practically a brand upon them, affixed by law, an assertion of their inferiority, and a stimulant [to] prejudice," the very prejudice undergirding the Act. *Strauder v. West Virginia,* 100 U.S. (10 Otto) 303, 308, 25 L.Ed. 664 (1879). Voting, taking public office, serving on juries, and serving in the military are the primary acts of public citizenship. In this court's judgment, equal protection forbids the government to erect barriers to the full participation of the plaintiffs in this case as American citizens.

That the government gives legal effect to prejudice in the military forces and not in civilian government employment does not make the discrimination any more valid. "Implicit in the term 'national defense' is the notion of defending those values and ideals which set this Nation apart." *United States v. Robel,* 389 U.S. 258, 264, 88 S.Ct. 419, 424,

19 L.Ed.2d 508 (1967). A Service called on to fight for the principles of equality and free speech embodied in the United States Constitution should embrace those principles in its own ranks.

### XIV.

■ This court holds that the Act's imposition of unequal conditions on homosexuals as a prerequisite to serving their country in the armed forces is invalid under the equal protection component of the Fifth Amendment to the Constitution.

Three opinions in other circuit courts are inconsistent with this holding. Those cases are distinguishable. In *Philips v. Perry*, 106 F.3d 1420 (9th Cir.1997), Phillips announced that he had had "sexual relations," presumably sodomy, with men about a dozen times and that he would continue to do so. He thus admitted a violation of Article 125 of the Military Code making sodomy a crime.

*Thomasson v. Perry*, 80 F.3d 915 (4th Cir.), *cert. denied*, — U.S. —, 117 S.Ct. 358, 136 L.Ed.2d 250 (1996), and *Richenberg v. Perry*, 97 F.3d 256 (8th Cir.1996), *petition for cert. filed*, 65 U.S.L.W. 3728 (Apr. 16, 1997), are authority only for the proposition adopted by the Second Circuit in this case, namely, that the limitation on speech in § 654(b)(2) is valid assuming that the ban on homosexual acts in § 654(b)(1) is valid.

Since this court has determined that § 654(1) is unconstitutional, the court holds that § 654(b)(2) is also unconstitutional. "[A] limitation on speech in support of an unconstitutional objective cannot be sustained." *Able*, 88 F.3d at 1300.

The court declares 10 U.S.C. §§ 654(b)(1) and 654(b)(2) invalid under the First and Fifth Amendments to the Constitution and enjoins defendants from enforcing them against plaintiffs.

So ordered.