Lieutenant Colonel Jane ABLE, Petty Officer Robert Heigle, First Lieutenant Kenneth Osborn, Sergeant Steven Spencer, Lieutenant Richard von Wohld, and Seaman Werner Zehr, Plaintiffs–Appellees,

v.

UNITED STATES of America, William S. Cohen, Secretary of Defense, in his official capacity, Rodney E. Slater, Secretary of Transportation, Defendants–Appellants.

Docket No. 97–6205.

United States Court of Appeals, Second Circuit.

Argued April 2, 1998.

Decided Sept. 23, 1998.

John C. Hoyle, Department of Justice, Washington, DC (Zachary W. Carter, United States Attorney, Brooklyn, NY, Frank W. Hunger, Assistant Attorney General, Anthony J. Steinmeyer, E. Roy Hawkens, Appellate Staff, Civil Division, Department of Justice, Washington, DC, Maj. Douglas Mickle, United States Army, Arlington, VA, of counsel), for Defendants–Appellants/Cross–Appellees.

Beatrice Dohrn, New York, NY (Ruth E. Harlow, Lambda Legal Defense & Education Fund, New York, NY, Matthew Coles, American Civil Liberties Union Foundation, New York, NY), for Plaintiffs–Appellees/Cross–Appellants.

Melissa Wells–Petry, Washington, DC, for Amicus Curiae Family Research Council.

C. Dixon Osburn, Michelle Benecke, Servicemembers Legal Defense Network, Charles S. Sims, Gregory McCurdy, Heather Martinez, Proskauer Rose LLP, New York, NY, for Amicus Curiae Servicemembers Legal Defense Network.

Jeffrey Swope, Kenneth W. Salinger, Palmer & Dodge LLP, Boston, MA, for Amicus Curiae American Council on Education, the American Association of Colleges

of Nursing, American Association of Community Colleges, American Association of State Colleges and Universities, American College Personnel Association, Association of American Law Schools, Appalachian State University, Council of Graduate Schools, Duke University, Massachusetts Institute of Technology, National Association of State Universities and Land–Grant Colleges, National Association of Student Personnel Administrators, and NAWE: Advancing Women in Higher Education, Oregon State Board of Higher Education, Rutgers, State University of New York, Syracuse University, Trustees of Dartmouth College, Trustees of Princeton University, Trustees of Tufts University and Washington University in St. Louis.

Marjorie A. Silver, Chair, Standing Committee on Sex and Law, The Association of the Bar of the City of New York, New York, NY, Valerie J. Wald, Kristine L. Franklin, Kim Hawkins, New York, NY, for Amici Curiae Association of the Bar of the City of New York.

Before: FEINBERG, WALKER, and LEVAL, Circuit Judges.

JOHN M. WALKER, JR., Circuit Judge:

Defendants United States of America, William S. Cohen and Rodney E. Slater ("the government" or "the United States") appeal from the July 2, 1997 Memorandum and Order of the United States District Court for the Eastern District of New York (Eugene H. Nickerson, *Senior District Judge*), which found that § 571(b) of the National Defense Authorization Act for the Fiscal Year 1994 (the "Act"), *codified at* 10 U.S.C. § 654(b), which mandates the termination of a service member of the armed forces for engaging in homosexual conduct, violates the Equal Protection Clause of the Fifth Amendment. *See Able v. United States*, 968 F.Supp. 850, 865 (E.D.N.Y.1997). The government argues that the district court failed to accord the judgments of Congress and the military the proper deference in deciding the eligibility requirements for military service and that, under the correct standard, § 654(b) is constitutional.

## BACKGROUND

This appeal presents our second encounter with the merits of plaintiffs' constitutional challenge to the military's "don't ask, don't tell" policy toward homosexual members of the United States military. *See Able v. United States*, 88 F.3d 1280 (2d Cir.1996). We assume familiarity with the facts and procedural history of this case and will set forth only such background as is necessary to address the issues that remain on appeal.

The "don't ask, don't tell" policy is embodied in § 654(b) as well as various Department of Defense ("DoD") directives. Section 654(b) provides for a service member's separation from the armed services if he or she has: (1) "engaged in, attempted to engage in, or solicited another to engage in a homosexual act;" (2) "stated that he or she is a homosexual or bisexual, ... unless ... the member has demonstrated that he or she is not a person who engages in, attempts to engage in, has a propensity to engage in, or intends to engage in homosexual acts;" (3) or has "married or attempted to marry a person known to be of the same biological sex." 10 U.S.C. §§ 654(b)(1), (2), (3). The statute defines "homosexual act" as "(A) any bodily contact, actively undertaken or passively permitted, between members of the same sex for the purpose of satisfying sexual desires; and (B) any bodily contact which a reasonable person would understand to demonstrate a propensity or intent to engage in an act described in subparagraph (A)." 10 U.S.C. § 654(f)(3). DoD Directive 1332.14(H)(1)(a) (Dec. 21, 1993), which implements the statute, provides that:

Homosexual conduct is grounds for separation from the Military Services.... Homosexual conduct includes homosexual acts, a statement by a member that demonstrates a propensity or intent to engage in homosexual acts, or a homosexual marriage or attempted marriage. A statement by a member that demonstrates a propensity or intent to engage in homosexual acts is grounds for separation not because it reflects the member's sexual orientation, but because the statement indicates a likelihood that the member engages in or will engage in homosexual acts. A member's

sexual orientation is considered a personal and private matter, and is not a bar to continued service under this section unless manifested by homosexual conduct. . . .

A service member who has stated that he or she is gay is given the opportunity to rebut the presumption that he or she has a propensity to commit homosexual acts by presenting evidence to an administrative board that he or she "is not a person who engages in, attempts to engage in, has a propensity to engage in, or intends to engage in homosexual acts." Directive 1332.14(H)(1)(b)(2).

Plaintiffs filed the instant action on March 7, 1994, in the Eastern District of New York claiming that the Act and the DoD Directives violate their rights under the First and Fifth Amendments to free speech, equal protection, and expressive and intimate association, and violate due process by failing to give adequate notice of what speech or behavior is proscribed.

On April 4, 1994, the district court issued a preliminary injunction enjoining the military from taking action against the plaintiffs based on statements made in the course of the litigation. *See Able v. United States,* 847 F.Supp. 1038 (E.D.N.Y.1994). On June 13, 1994, the district court issued a second, broader preliminary injunction preventing the government from taking action against the plaintiffs for statements identifying themselves as homosexuals, regardless of whether or not they were made in connection with this lawsuit. The government appealed to this court, and we held that, while the injunction had been granted pursuant to an incorrect standard and should be reconsidered, it could nonetheless remain in place pending the district court's reconsideration. *See Able v. United States,* 44 F.3d 128, 132 (2d Cir.1995).

Following a four day trial, the district court held that 10 U.S.C. § 654(b)(2) (the "statements provision"), violated the Free Speech Clause of the First Amendment and the Equal Protection Clause of the Fourteenth Amendment. *See Able v. United States,* 880 F.Supp. 968, 980 (E.D.N.Y.1995). The district court concluded that the plaintiffs, who had not been the subject of discharge or other adverse proceedings, lacked standing to challenge § 654(b)(1) (the "acts prohibition") and dismissed that part of the complaint without prejudice. *See id.* at 970.

The government appealed, and we reversed. We held that the statements provision "substantially furthers the government's interest . . . in preventing the occurrence of homosexual acts in the military," *see Able,* 88 F.3d at 1296, and determined that "if the acts prohibition of subsection (b)(1) is constitutional . . . the statements presumption of subsection (b)(2) does not violate the First Amendment," *id.,* because the "subsections rise or fall together," *id.* at 1292. We also found that plaintiffs had standing to challenge § 654(b)(1), reinstated the acts provision claim and remanded to the district court to determine whether the acts provision violates the Equal Protection Clause.

On remand, the district court held that the acts provision violates the Equal Protection Clause. *See Able v. United States,* 968 F.Supp. at 865. The United States appealed, arguing that the district court failed to accord Congress the deference required in cases involving the military and that under the correct standard § 654 is constitutional.

## DISCUSSION

The Due Process Clause of the Fifth Amendment assures every person the equal protection of the laws, "which is essentially a direction that all persons similarly situated should be treated alike." *City of Cleburne v. Cleburne Living Ctr., Inc.,* 473 U.S. 432, 439, 105 S.Ct. 3249, 87 L.Ed.2d 313 (1985). Of course, the government can treat persons differently if they are not "similarly situated." As a general rule, the equal protection guarantee of the Constitution is satisfied when the government differentiates between persons for a reason that bears a rational relationship to an appropriate governmental interest. *See Heller v. Doe,* 509 U.S. 312, 320, 113 S.Ct. 2637, 125 L.Ed.2d 257 (1993). However, in limited circumstances when the subject of the different treatment is a member of a class that historically has been the object of discrimination, the Supreme Court has required a higher degree of justification than a rational basis, either strict or intermediate scrutiny. Under the strict scrutiny test the government must demonstrate a compelling need for the different treatment and that the provision in question is narrowly tailored

to achieve its objective. *See McLaughlin v. Florida,* 379 U.S. 184, 192, 85 S.Ct. 283, 13 L.Ed.2d 222 (1964). Under intermediate scrutiny, the government must at least demonstrate that the classification is substantially related to an important governmental objective. *See United States v. Virginia,* 518 U.S. 515, 533, 116 S.Ct. 2264, 135 L.Ed.2d 735 (1996). The suspect or quasi-suspect classes that are entitled to heightened scrutiny have been limited to groups generally defined by their status, such as race, national ancestry or ethnic origin, alienage, gender and illegitimacy, and not by the conduct in which they engage.

The government argues that the Act in this case proscribes homosexual conduct and that, since any governmental differentiation is based on conduct, not status, no heightened scrutiny is required. The government adds, moreover, that even if, as plaintiffs contend, the Act targets homosexuals based on status, heightened scrutiny still would not be appropriate because other circuits reviewing the Act have not recognized homosexuals as a suspect class and have applied a rational basis test. *See, e.g., Richenberg v. Perry,* 97 F.3d 256, 260–61 (8th Cir.1996), *cert. denied,* —— U.S. ——, 118 S.Ct. 45, 139 L.Ed.2d 12 (1997); *Thomasson v. Perry,* 80 F.3d 915, 928 (4th Cir.), *cert. denied,* —— U.S. ——, 117 S.Ct. 358, 136 L.Ed.2d 250 (1996).

In striking down the Act as failing to bear even a rational relationship to a legitimate governmental interest, the district court strongly suggested that in reviewing statutes that discriminate on the basis of homosexuality heightened scrutiny would be appropriate. *See Able,* 968 F.Supp. at 861–64. We need not decide this question because at oral argument plaintiffs asserted that they were not seeking any more onerous standard than the rational basis test. Accordingly, the sole question before us is whether the Act survives rational basis review.

In a long series of cases, the Supreme Court has narrowly defined the concept of rational basis review. In *Heller,* 509 U.S. at 319, 113 S.Ct. 2637 (quoting *FCC v. Beach Communications, Inc.,* 508 U.S. 307, 313, 113 S.Ct. 2096, 124 L.Ed.2d 211 (1993)), the Supreme Court held that "rational-basis review

in equal protection analysis 'is not a license for courts to judge the wisdom, fairness, or logic of legislative choices.' " Rather, "a classification neither involving fundamental rights nor proceeding along suspect lines is accorded a strong presumption of validity," *id.,* which " 'must be upheld against equal protection challenge if there is any reasonably conceivable state of facts that could provide a rational basis for the classification,' " *id.* at 320, 113 S.Ct. 2096 (quoting *Beach Communications,* 508 U.S. at 313, 113 S.Ct. 2096). Under the rational basis test, the government "has no obligation to produce evidence to sustain the rationality of a statutory classification." *Id.* We will assume that a statute is constitutional and "the burden is on the one attacking the legislative arrangement to negative every conceivable basis which might support it, whether or not the basis has a foundation in the record." *Id.* at 320–21, 113 S.Ct. 2096 (citations and internal quotations omitted).

In the military setting, the Supreme Court has narrowed our review in a further respect. As we discussed in our previous opinion, we are required to give great deference to Congressional judgments in matters affecting the military. *See Able,* 88 F.3d at 1293–94. The Supreme Court has instructed that " 'judicial deference ... is at its apogee when legislative action under the congressional authority to raise and support armies and make rules and regulations for their governance is challenged.' " *Goldman v. Weinberger,* 475 U.S. 503, 508, 106 S.Ct. 1310, 89 L.Ed.2d 478 (1986) (quoting *Rostker v. Goldberg,* 453 U.S. 57, 70, 101 S.Ct. 2646, 69 L.Ed.2d 478 (1981)). This is especially the case where, as here, the challenged restriction was the result of exhaustive inquiry by Congress in hearings, committee and floor debate. *See Rostker,* 453 U.S. at 64, 72, 101 S.Ct. 2646.

Moreover, in the military context, the Court has recognized that "[t]he essence of military service 'is the subordination of the desires and interests of the individual to the needs of the service.' " *Goldman,* 475 U.S. at 507, 106 S.Ct. 1310 (quoting *Orloff v. Willoughby,* 345 U.S. 83, 92, 73 S.Ct. 534, 97 L.Ed. 842 (1953)). Courts are to "give great deference to the professional judgment of

military authorities concerning the relative importance of a particular military interest." *Id.* The framers did not view the federal judiciary—appointed with life tenure—as the appropriate body to exercise military authority and therefore gave the judiciary "no influence over either the sword or the purse." THE FEDERALIST No. 78, at 520 (Alexander Hamilton) (Heritage Press ed., 1945). In these circumstances, we "must be particularly careful not to substitute our judgment of what is desirable for that of Congress, or our own evaluation of evidence for a reasonable evaluation by the Legislative Branch." *Rostker,* 453 U.S. at 68, 101 S.Ct. 2646.

Deference by the courts to military-related judgments by Congress and the Executive is deeply recurrent in Supreme Court caselaw and repeatedly has been the basis for rejections to a variety of challenges to Congressional and Executive decisions in the military domain. For example, the Supreme Court has upheld Congress's delegation of authority to the President to define factors for the death penalty in military capital cases, *see Loving v. United States,* 517 U.S. 748, 768, 116 S.Ct. 1737, 135 L.Ed.2d 36 (1996); Congress's authority to order members of the National Guard into active federal duty for training outside the United States, *see Perpich v. Department of Defense,* 496 U.S. 334, 353–54, 110 S.Ct. 2418, 110 L.Ed.2d 312 (1990); the President's authority as Commander in Chief to "control access to information bearing on national security," *Department of Navy v. Egan,* 484 U.S. 518, 527, 108 S.Ct. 818, 98 L.Ed.2d 918 (1988); Congress's decision to authorize registration only of males for the draft, *see Rostker,* 453 U.S. at 83, 101 S.Ct. 2646; Congress's regulation of the conduct of military personnel under the Uniform Code of Military Justice, *see Parker v. Levy,* 417 U.S. 733, 749–52, 94 S.Ct. 2547, 41 L.Ed.2d 439 (1974); and the President's discretion as Commander in Chief to commission all Army officers, *see Orloff,* 345 U.S. at 90, 73 S.Ct. 534.

█ In full recognition that within the military individual rights must of necessity be curtailed lest the military's mission be impaired, courts have applied less stringent standards to constitutional challenges to military rules, regulations and procedures than they have in the civilian context. Thus, "[o]ur review of military regulations ... is far more deferential than constitutional review of similar laws or regulations designed for civilian society." *Goldman,* 475 U.S. at 507, 106 S.Ct. 1310.

█ Justice is afforded on different terms than is found in civilian life because the military is a "specialized community governed by a separate discipline." *Parker,* 417 U.S. at 744, 94 S.Ct. 2547 (quoting *Orloff,* 345 U.S. at 94, 73 S.Ct. 534). Before a military tribunal, a defendant's constitutional rights are diminished. There is no right to a trial by a jury of one's peers. *See Kahn v. Anderson,* 255 U.S. 1, 8–9, 41 S.Ct. 224, 65 L.Ed. 469 (1921). The right of appeal from a criminal conviction is restricted. *See* 28 U.S.C. § 1259 (defining terms for writ of certiorari to the Supreme Court from Court of Appeals for the Armed Forces); 10 U.S.C. § 867 (defining terms of review by Court of Appeals for the Armed Forces); 10 U.S.C. § 866 (review by Court of Criminal Appeals). Habeas corpus relief is circumscribed. *See Burns v. Wilson,* 346 U.S. 137, 138–42, 73 S.Ct. 1045, 97 L.Ed. 1508 (1953). Fourth Amendment protections are less available. *See United States v. Stuckey,* 10 M.J. 347, 357, 361 (C.M.A.1981); *United States v. Middleton,* 10 M.J. 123, 126–27 (C.M.A.1981).

Furthermore, courts have deferred to military judgments that restrict First Amendment privileges including requiring members of the Air Force to obtain approval before circulating petitions on air force bases, *see Brown v. Glines,* 444 U.S. 348, 357, 100 S.Ct. 594, 62 L.Ed.2d 540 (1980), and restricting political speeches and distribution of political leaflets on military bases, *see Greer v. Spock,* 424 U.S. 828, 838, 96 S.Ct. 1211, 47 L.Ed.2d 505 (1976).

█ The free exercise of religion is also limited in the military setting. In employing its power to raise troops, Congress has been given considerable freedom to exempt some citizens from military service for religious reasons while denying exemption or discharge from service to others who invoke the free exercise clause of the Constitution. *See, e.g., Gillette v. United States,* 401 U.S. 437, 462, 91 S.Ct. 828, 28 L.Ed.2d 168 (1971). Regulations regarding the dress code in the military have been held to override a religious practice dictated by Orthodox Judaism, so that a member of the service can be

discharged from service if he conscientiously obeys a principle of his religion in direct contravention of a military order. *See Goldman*, 475 U.S. at 509, 106 S.Ct. 1310.

█ The conclusion that we draw from these pronouncements is that, while we are not free to disregard the Constitution in the military context, *see Rostker*, 453 U.S. at 67, 101 S.Ct. 2646; *Crawford v. Cushman*, 531 F.2d 1114, 1120 (2d Cir.1976) ("a succession of cases in this circuit and others has reiterated the proposition that the military is subject to the Bill of Rights and its constitutional implications."); *Chappell v. Wallace*, 462 U.S. 296, 304, 103 S.Ct. 2362, 76 L.Ed.2d 586 (1983) (quoting Earl Warren, The Bill of Rights and the Military, 37 N.Y.U. L.Rev. 181, 188 (1962)) (" 'our citizens in uniform may not be stripped of basic rights simply because they have doffed their civilian clothes' "), we owe great deference to Congress in military matters. Although deference does not equate to abdication of our constitutional role, *see Rostker*, 453 U.S. at 67, 101 S.Ct. 2646, in considering whether there is substance to the government's justification for its action, courts are ill-suited to second-guess military judgments that bear upon military capability or readiness.

█ In this litigation, the United States has justified § 654's prohibition on homosexual conduct on the basis that it promotes unit cohesion, enhances privacy and reduces sexual tension. The plaintiffs have attacked each of these rationales as simply masking irrational prejudice against homosexuals. The plaintiffs argue that an illegitimate purpose can never support the different treatment accorded to homosexual as compared to heterosexual conduct, *see Cleburne Living Ctr.*, 473 U.S. at 448, 105 S.Ct. 3249, and that the Act violates the Fifth Amendment's equal protection guarantee. Moreover, plaintiffs contend that the government's proffered reasons, unit cohesion, privacy and the reduction in sexual tensions, are not rationally related to the Act's prohibition on homosexual conduct. In this case, we believe that the rationales provided by the United States, grounded in the extensive findings set forth in the Act itself, are sufficient to withstand both aspects of plaintiffs' equal protection challenge.

First, plaintiffs rely on *Romer v. Evans*, 517 U.S. 620, 116 S.Ct. 1620, 134 L.Ed.2d 855 (1996); *Cleburne Living Ctr.*, 473 U.S. at 448, 105 S.Ct. 3249; and *Palmore v. Sidoti*, 466 U.S. 429, 104 S.Ct. 1879, 80 L.Ed.2d 421 (1984), for the proposition that the Act cannot survive even rational basis review because it is motivated by irrational fear and prejudice toward homosexuals. In these cases, the Supreme Court held that the accommodation of an individual's bias or animosity can never serve as a legitimate government interest; "mere negative attitudes, or fear, unsubstantiated by factors which are properly cognizable in [the circumstances], are not permissible bases" for differential treatment by the government. *Cleburne Living Ctr.*, 473 U.S. at 448, 105 S.Ct. 3249.

The analysis set forth in *Romer, Cleburne Living Ctr.*, and *Palmore* differed from traditional rational basis review because it forced the government to justify its discrimination. Moreover, the Court did not simply defer to the government; it scrutinized the justifications offered by the government to determine whether they were rational.

In this case, plaintiffs' reliance on *Romer, Cleburne Living Ctr.* and *Palmore* is misplaced. Those cases did not arise in the military setting. In the civilian context, the Court was willing to examine the benign reasons advanced by the government to consider whether they masked an impermissible underlying purpose. In the military setting, however, constitutionally-mandated deference to military assessments and judgments gives the judiciary far less scope to scrutinize the reasons, legitimate on their face, that the military has advanced to justify its actions.

Moreover, in this case the military's justifications are based on factors which are unique to military life. The military argues that the prohibition on homosexual conduct is necessary for military effectiveness because it maintains unit cohesion, reduces sexual tension and promotes personal privacy. These concerns distinguish the military from civilian life and go directly to the military's need to foster "instinctive obedience, unity, commitment, and esprit de corps." *Goldman*, 475 U.S. at 507, 106 S.Ct. 1310.

*Romer* and *Cleburne Living Ctr.* also differ from this case because they involved restrictions based on status. In our previous opinion, we rejected plaintiffs' argument that the Act was only a status-based prohibition and held that the Act targets conduct. *See Able,* 88 F.3d at 1297–99; *see also* DoD Directive 1332.14(H)(1)(a) (a service member's "sexual orientation . . . is not a bar to continued service").

Plaintiffs also contend that the government's proffered reasons, unit cohesion, privacy and the reduction in sexual tensions, are not rationally related to the Act's prohibition on homosexual conduct. As discussed above, our review of this question is circumscribed both by the nature of rational basis review and our recognition of the special status of the military. In these circumstances, in evaluating whether the government's announced purposes are rationally related to the Act's prohibition of conduct, we defer to the judgment of Congress. The Act is entitled to "a strong presumption of validity," and must be sustained if " 'there is any reasonably conceivable state of facts that could provide a rational basis for the classification.' " *Heller,* 509 U.S. at 319–20, 113 S.Ct. 2637 (quoting *Beach Communications,* 508 U.S. at 313, 113 S.Ct. 2096). Under this standard, the Act does not violate the Equal Protection Clause.

The Act is supported by extensive Congressional hearings and deliberation. In reaching its decision, Congress relied on testimony from military officers, defense experts, gay rights advocates, and other military personnel as well as reports by both houses explaining their conclusions. *See* S.Rep. No. 103–112 (1993); H.R.Rep. No. 103–200 (1993). After this extensive legislative examination, embodied in numerous findings, *see* § 654(a), we cannot say that the reliance by Congress on the professional judgment and testimony of military experts and personnel that those who engage in homosexual acts would compromise the effectiveness of the military was irrational.

Numerous · military leaders testified that regulation of homosexual conduct is necessary to unit cohesion and the military mission. *See, e.g.,* S.Rep. No. 103–112, at 280 (1994) (statement of General H. Norman Schwarzkopf) ("[i]n my years of military service, I have experienced the fact that the introduction of an open homosexual into a small unit immediately polarizes that unit and destroys the very bonding that is so important for the unit's survival in time of war"); *id.* at 281 (statement of General Colin Powell) (open homosexuality in units "involves matters of privacy and human sexuality that, in our judgment, if allowed to exist openly in the military, would affect the cohesion and well-being of the force"). It was rational for Congress to credit the testimony of these military officers and defense experts. *See Goldman,* 475 U.S. at 508–10, 106 S.Ct. 1310 ("considered professional judgment" of military officials regarding the importance of uniformity of dress was sufficient to justify restrictions on . . . religious liberty).

As we described in our previous decision, after Congress and the Executive reviewed the policies regarding homosexuals in the military, Congress made detailed findings in support of § 654 which were embodied in the Act itself. *See Able,* 88 F.3d at 1284–86. Congress justified its decision to enact § 654 in fifteen separate findings including the following:

> Military life is fundamentally different from civilian life in that . . . the extraordinary responsibilities of the armed forces, the unique conditions of military service, and the critical role of unit cohesion, require that the military community, while subject to civilian control, exist as a specialized society; and . . . the military society is characterized by its own laws, rules, customs, and traditions, including numerous restrictions on personal behavior, that would not be acceptable in civilian society. . . .
>
> The pervasive application of the standards of conduct is necessary because members of the armed forces must be ready at all times for worldwide deployment to a combat environment.
>
> The worldwide deployment of United States military forces, the international responsibilities of the United States, and the potential for involvement of the armed forces in actual combat routinely make it necessary for members of the armed forces involuntarily to accept living condi-

tions and working conditions that are often spartan, primitive, and characterized by forced intimacy with little or no privacy.

The prohibition against homosexual conduct is a longstanding element of military law that continues to be necessary in the unique circumstances of military service.

The armed forces must maintain personnel policies that exclude persons whose presence in the armed forces would create an unacceptable risk to the armed forces' high standards of morale, good order and discipline, and unit cohesion that are the essence of military capability.

The presence in the armed forces of persons who demonstrate a propensity or intent to engage in homosexual acts would create an unacceptable risk to the high standards of morale, good order and discipline, and unit cohesion that are the essence of military capability.

Given the strong presumption of validity we give to classifications under rational basis review and the special respect accorded to Congress's decisions regarding military matters, we will not substitute our judgment for that of Congress. *See Rostker*, 453 U.S. at 68, 101 S.Ct. 2646. We find that Congress has proffered adequate justifications for the Act. The testimony of numerous military leaders, the extensive review and deliberation by Congress, and the detailed findings set forth in the Act itself provide a "reasonably conceivable state of facts," *Heller*, 509 U.S. at 320, 113 S.Ct. 2637, to uphold the Act. We conclude that under rational basis review § 654 does not violate the Equal Protection Clause of the Constitution.

In our previous opinion, we held that the statements provision § 654(b)(2) "substantially furthers the government's interest ... in preventing the occurrence of homosexual acts in the military," and concluded that "if the acts prohibition of subsection (b)(1) is constitutional ... the statements presumption of subsection (b)(2) does not violate the First Amendment." *Able*, 88 F.3d at 1296. Because we now hold that the acts prohibition, § 654(b)(1), is constitutional, we therefore conclude that the prohibition on statements, § 654(b)(2), is constitutional as well.

## CONCLUSION

Accordingly, we reverse the judgment of the district court.