**Sandra LAVOIE–FRANCISCO and
Gary Zerjav, Plaintiffs,**

v.

**TOWN OF COVENTRY, Joseph Callahan, Alfred Chiulli, and Al–Fred Builders & Developers, LLC, Defendants.**

No. 3:05CV00978(DJS).

United States District Court,
D. Connecticut.

Oct. 10, 2008.

John R. Williams, New Haven, CT, Anthony C. Defilippis, Jr., Defilippis & Associates, LLC, West Hartford, CT, for Plaintiffs.

Frederick M. O'Brien, Regnier, Taylor, Curran & Eddy, Hartford, CT, Michael P. Barry, Barry, Harvey & Later, Pc., Wethersfield, CT, for Defendants.

### MEMORANDUM OF DECISION AND ORDER

DOMINIC J. SQUATRITO, District Judge.

The plaintiffs, Sandra Lavoie–Francisco ("Lavoie–Francisco") and Gary Zerjav ("Zerjav") (collectively, "the Plaintiffs"), bring this action against the defendants, the Town of Coventry ("the Town"), Joseph Callahan ("Callahan") (collectively, "the Municipal Defendants"), Alfred Chiulli ("Chiulli"), and Al–Fred Builders & Developers, LLC ("Al–Fred") (collectively, "the Contractor Defendants") alleging that: (1) the Municipal Defendants violated their Fourteenth Amendment right to equal protection; and (2) the Contractor Defendants violated Connecticut's New Home Construction Contractors Act, Conn. Gen.Stat. §§ 20–417a *et seq.*, and the Connecticut Unfair Trade Practices Act, Conn. Gen.Stat. §§ 42–110a *et seq.*

The Municipal Defendants and Chiulli have filed motions for summary judgment (dkt. # s 81 & 87) pursuant to Rule 56 of the Federal Rules of Civil Procedure ("Fed. R. Civ.P."). For the reasons that hereafter follow, both motions for summary judgment (**dkt. # s 81 & 87**) are **GRANTED.** Additionally, the Plaintiff's state law claims against Al–Fred are **DISMISSED without prejudice to the Plaintiff bringing that claim in state court.**

### I. FACTS

The Town is a municipal corporation. At all times relevant to this case, the Plaintiffs were residents of the Town, and Callahan was a building official for the Town. Al–Fred is a limited liability company in the business of constructing residential homes. Chiulli is the sole member and manager of Al–Fred.

In 2003, the Plaintiffs entered into a contract with Al–Fred for the construction and purchase of a new house at 330 Bunker Hill Road ("the Property") in Coventry, Connecticut. Al–Fred was the general contractor for the job. Callahan, in the performance of his official duties, conducted several inspections of the Property. After completing his inspections, Callahan signed a Certificate of Occupancy for the Property.

The Plaintiffs allege that, after the Contractor Defendants purportedly had completed construction, and after the Plaintiffs had purchased and entered their new home, numerous defects in the Property became apparent, including: electrical problems; septic problems; pitch and drainage problems in the yard; a leaky roof; mold in the basement; buried logs and siding in the yard; and generally poor workmanship (e.g., doors that did not close properly and light socket openings that were too large). The Plaintiffs contend that the Contractor Defendants violated the applicable building code regulations, and that Callahan ignored those violations.

Callahan has acknowledged that he did, in fact, "overlook[ ] several minor code violations ... and a few other technical defects." (Dkt. # 81, Callahan Aff. ¶ 4.) He has further stated that "[t]hese errors of judgment and/or perception were all solely [his]," and that they resulted from his "being pressed for time and [his] lack of awareness, at that point, that the builder may be prone to shoddy work." (*Id.* ¶ 5.) According to Callahan, he recalled that the "builder had built one or two other houses in Coventry before this one and had been cooperative as to correcting problems in those instances. To [his] best recollection, [he] had no reason to suspect [the builder] was an untrustworthy person at the time [he] performed the final inspection...." (*Id.*) He denies, however, that he intentionally ignored serious defects in the Contractor Defendants' work.

The parties dispute what happened after the Plaintiffs discovered the defects in the Property. To say that the Plaintiffs found the Contractor Defendants' work to be unsatisfactory would be an understatement. Callahan claims that he made numerous efforts to mediate the disputes between the Plaintiffs and the Contractor Defendants, and that he tried to facilitate communication between them for a satisfactory resolution of the issues. According to Callahan, the Plaintiffs hired an attorney and ultimately broke off discussions with the Contractor Defendants. Callahan maintains that, because the Plaintiffs refused to negotiate or deal with the Con-

tractor Defendants, his ability to assist them in correcting the defects in the Property ended, and all existing or subsequent code violations became the sole responsibility of the Plaintiffs. Callahan issued a Notice of Violation ("the Notice") to the Plaintiffs for the code violations on the Property. Callahan states that, after consulting with Christopher Laux, the State Building Inspector, he followed Laux' "explicit direction" in issuing the Notice.

The Plaintiffs tell a different story. To begin with, the Plaintiffs apparently had difficulties in dealing with Chiulli. According to the Plaintiffs, Chiulli stole a $2,500 propane fireplace from the Property.[1] The Plaintiffs also claim that Chiulli subjected Lavoie–Francisco to a pattern of sexual harassment when talking on the telephone or whenever he caught her alone. Thus, the Plaintiffs say they that they were uncomfortable with having Chiulli on their Property. Nevertheless, they claim that, at all times, they expressed (via their attorney) to Callahan and Chiulli their willingness to work with Chiulli and his subcontractors. The Plaintiffs deny that they ever cut off all contact with Chiulli. The Plaintiffs also deny Callahan's description of his interaction with Laux. According to the Plaintiffs, there is no evidence that Laux gave Callahan any "explicit direction" in issuing the Notice.

## II. DISCUSSION[2]

The Plaintiffs allege that the Municipal Defendants violated their Fourteenth

---

1. The Plaintiffs represent that, pursuant to a warrant issued by a judge of the Connecticut Superior Court, Chiulli was arrested and charged with Larceny in the Third Degree. They further represent that, at the time they filed their opposition to the summary judgment motion, this criminal case was pending in the Connecticut Superior Court. The court is unaware of the disposition of that criminal case.

2. In his summary judgment motion, Chiulli argues that, even though he was a member of Al–Fred, he personally cannot be held liable for Al–Fred's conduct because Al–Fred is a limited liability company. The Plaintiffs have not refuted this argument, and they did not file an opposition to Chiulli's summary judgment motion. Therefore, Chiulli's motion for summary judgment (**dkt.# 87**) is **GRANTED** absent objection, and the court need analyze only the Municipal Defendants' motion.

Amendment right to equal protection. The Municipal Defendants argues the Plaintiffs' equal protection claim fails as a matter of law and that summary judgment should be granted in her favor. The court shall discuss the parties' arguments seriatim.

## A. SUMMARY JUDGMENT STANDARD

A motion for summary judgment may be granted "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c).

Summary judgment is appropriate if, after discovery, the nonmoving party "has failed to make a sufficient showing on an essential element of [its] case with respect to which [it] has the burden of proof." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). "The burden is on the moving party 'to demonstrate the absence of any material factual issue genuinely in dispute.'" *Am. Int'l Group, Inc. v. London Am. Int'l Corp.*, 664 F.2d 348, 351 (2d Cir.1981) (quoting *Heyman v. Commerce & Indus. Ins. Co.*, 524 F.2d 1317, 1319–20 (2d Cir. 1975)).

A dispute concerning a material fact is genuine "'if evidence is such that a reasonable jury could return a verdict for the nonmoving party.'" *Aldrich v. Randolph Cent. Sch. Dist.*, 963 F.2d 520, 523 (2d

Cir.1992) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986)). The Court must view all inferences and ambiguities in a light most favorable to the nonmoving party. *See Bryant v. Maffucci*, 923 F.2d 979, 982 (2d Cir.1991). "Only when reasonable minds could not differ as to the import of the evidence is summary judgment proper." *Id.*

## B. EQUAL PROTECTION

The Fourteenth Amendment to the United States Constitution provides that "[n]o state shall ... deny to any person within its jurisdiction the equal protection of the laws." U.S. Const. amend. XIV, § 1. The Supreme Court has held that the Equal Protection Clause is "essentially a direction that all persons similarly situated should be treated alike." *City of Cleburne, Tex. v. Cleburne Living Ctr. Inc.*, 473 U.S. 432, 439, 105 S.Ct. 3249, 87 L.Ed.2d 313 (1985). In this case, the Plaintiffs present alternate equal protection principles: (1) the traditional "classification-based" equal protection principle; and (2) the "class-of-one" equal protection principles.

### 1. Classification–Based Equal Protection Claim [3]

■■■ "Traditionally, the Equal Protection clause of the Fourteenth Amendment protects against [classification-based] discrimination." *Goldfarb v. Town of West Hartford*, 474 F.Supp.2d 356, 366 (D.Conn.

**3.** In the "Class–Based Equal Protection Violation" section of their opposition memorandum, the Plaintiffs discuss the "selective enforcement" of the Town's building code. The court believes this was in error. In the Second Circuit, selective enforcement equal protection claims spring from the decision *LeClair v. Saunders*, 627 F.2d 606, 609–10 (2d Cir.1980). As this court recently stated "[t]he Second Circuit has styled the *LeClair* selective

prosecution theory as a species of class-of-one equal protection...." *Spanierman v. Hughes*, 576 F.Supp.2d 292, 2008 WL 4224483, at *10 (D.Conn.2008) (citing *Harlen Assocs. v. Inc. Vill. of Mineola*, 273 F.3d 494, 499 (2d Cir. 2001)). Thus, a selective enforcement claim does not fall under the "class-based" equal protection theory. The court shall, however, discuss selective enforcement when discussing class-of-one claims.

2007) (internal quotation marks omitted). That is to say, the courts

> apply different levels of scrutiny to different types of classifications. At a minimum, a statutory classification must be rationally related to a legitimate governmental purpose.... Classifications based on race or national origin ... and classifications affecting fundamental rights ... are given the most exacting scrutiny. Between these extremes of rational basis review and strict scrutiny lies a level of intermediate scrutiny, which generally has been applied to discriminatory classifications based on sex or illegitimacy.

*Clark v. Jeter*, 486 U.S. 456, 461, 108 S.Ct. 1910, 100 L.Ed.2d 465 (1988) (internal citations omitted). As the Second Circuit has pointed out, rational basis review generally applies, whereas the higher forms of review (i.e., strict scrutiny and intermediate scrutiny) apply in the "limited circumstances" where "the subject of the different treatment is a member of a class that historically has been the object of discrimination." *Able v. United States*, 155 F.3d 628, 631–32 (2d Cir.1998).

■ Here, the "class" to which the Plaintiffs claim they belong is made up of "persons constructing and buying individual residences."[4] (Dkt.# 97–1, p. 17.) The court notes at the outset that, given such a classification, a rational basis review applies in this case. Those who construct and buy individual residences historically have not been objects of discrimination, and the Supreme Court has not recognized that such a class is entitled to a heightened form of scrutiny.

According to the Plaintiffs, the Town's attorney, Michael Zizka ("Zizka"), stated during the November 16, 2004 Coventry Town Meeting that "it was the policy of the Town to enforce the Building Code differently with respect to home buyers in comparison to all others constructing buildings in the Town. ... [and] to be more relaxed about Code enforcement in the case in individual buyers." (Dkt. # 97 ¶ 27.) The Municipal Defendants dispute the Plaintiffs' characterization of Zizka's statements, and deny that the Town has any such policy.

The Municipal Defendants have submitted a portion of the transcript of Zizka's statements made during the November 16, 2004 Town Meeting. The relevant portion of that submission reads as follows:

> Now, in the case of building a single-family residential home, that is one of the least restrictive zoning activities, and it's true in almost every town. Very few towns regulate the building of a single-family home very heavily. The reason for that is, I think, fairly obvious, that a lot of people that are building homes are young couples, young families or whatever. A lot of times it's developers, but many times, you know, it's a young person or, you know, any person who buys a lot and just wants to build a house. And you don't want to necessarily put them through the kind of expensive regulation that you would with more sophisticated development.

> So, typically, with a single-family residential home, you don't require a formal site plan review, you don't require a formal grading plan, you don't require formal drainage calculations or analyses. That's typically true in single-family homes, because if you were to do that, the cost of the development of the lot would probably go up by 30 or $40,000.00 per lot and that just tends to price people out of the market, especial-

---

**4.** The Plaintiffs apparently wish to contrast this class to the class of people who construct and buy commercial buildings.

ly, you know, lower or moderate income families. So for single-family homes, there's usually not a lot of regulation.

Now, what there are, are regulations that deal with—in fact, there's a state law on sediment and erosion control that specifically—it says every development ... that is going to disturb more than a half acre has to have a sediment and erosion control plant but it exempts single-family residential. So even the state does that. ...

So what the towns have instead is a situation where if the activity on the property is found to be causing problems that are within the town's regulatory scope to address, then they can address them.

So what had to happen in this situation is the town had to look into the situation as to what this applicant is doing on the property, is there anything about what this applicant is doing that constitutes a violation of zoning regulations, wetlands regulations and so forth.[5] If the town determines that there is a violation, then it can proceed against those violations.

But in the normal course, simply bringing fill onto a residential lot or grading a residential lot or installing footing drains or whatever in a residential lot are usually not regulated by zoning. ...

(Dkt.# 105, Ex. 1, 4:4–6:12.)

Upon reviewing the transcript, the court believes that the Plaintiffs' assertions regarding Zizka's statements are somewhat inaccurate. The Plaintiffs appear to be arguing that Zizka's statement show the Town was less likely to enforce its building code regulations, and less likely to require contractors to remedy building code viola-

tions, in situations involving the construction of private residences. The court does not see Zizka's statements as going so far. Instead, Zizka seems to be saying that the Town did not require certain formalities for the construction of single-family homes. He did not state that the Town would not enforce its building code regulations or ignore building code violations for the construction of private residences.

■ Even if, however, the court were to assume that the Town had a policy of treating persons constructing and buying individual residences differently from those constructing and buying other types of buildings, it need only have a rational basis for doing so. Upon reading Zizka's statements, the Town has such a rational basis. It appears the Town recognizes that often private individuals, instead of developers, undertake the construction of single-family homes. Thus, in an effort to save those individuals money, the Town does not require the formalities, nor does it require the oversight, required in the construction of other types of buildings. Not only would this constitute a rational basis for the Town's conduct, such a basis is intended, in theory, to assist people like the Plaintiffs, i.e., those individuals who want to construct their own homes. Thus, the Plaintiff's classification-based equal protection claim fails as a matter of law.

The Plaintiffs assert that they attended a meeting with Callahan and the Town Manager, John Elsesser ("Elsesser"), during which they described in detail the building code violations on their Property, and complained about Callahan's handling of their situation with Chiulli. According to the Plaintiffs, Elsesser approved of Callahan's handling of the matter, and stated

---

5. Based upon this transcript, it appears that someone posed a question to Zizka regarding an "applicant," presumably a contractor, against whom complaints had been made.

Although it very well may be Chiulli, the court does not actually know the identity of the applicant referenced in the transcript.

that it is the Town's practice to treat Chiulli more gently and with greater deference than other builders. Even if the court were to accept as fact that the Town had a deferential policy towards Chiulli, such a fact would not support the Plaintiff's classification-based equal protection claim. Classification-based equal protection claims require plaintiffs to demonstrate that they were treated differently because of their membership in a particular group. That the Town may have treated Chiulli with kid gloves is beside the point. Instead, it is the Town's treatment of the Plaintiffs, as persons constructing and buying an individual residence, that matters here. As described above, the Plaintiff's classification-based equal protection claim fails as a matter of law. Consequently, with regard to the Plaintiff's classification-based equal protection claim, the Municipal Defendants' motion for summary judgment (**dkt.# 81**) is **GRANTED.**

### 2. Class–of–One Equal Protection Claims

In addition to their the "traditional," i.e., classification-based, equal protection claim, the Plaintiffs also rely on "two related, yet different, equal protection arguments." *Cobb v. Pozzi,* 363 F.3d 89, 109 (2d Cir. 2004). First, the Plaintiffs bring "class-of-one" equal protection claim based on the Supreme Court's decision in *Village of Willowbrook v. Olech,* 528 U.S. 562, 564, 120 S.Ct. 1073, 145 L.Ed.2d 1060 (2000). Second, pursuant to the Second Circuit's opinion in *LeClair v. Saunders,* 627 F.2d 606, 609–10 (2d Cir.1980), the Plaintiffs seem to be asserting a "selective enforce-

ment" claim. The court shall analyze both arguments in turn.

#### a. *Olech* "Class–of–One"

■ In *Olech,* the Supreme Court recognized that successful class-of-one equal protection claims can be brought "where the plaintiff alleges that [ ]he has been intentionally treated differently from others similarly situated and that there is no rational basis for the difference in treatment." *Olech,* 528 U.S. at 564, 120 S.Ct. 1073. Courts allow plaintiffs to bring class-of-one claims because "[t]he purpose of the equal protection clause of the Fourteenth Amendment is to secure every person within the State's jurisdiction against intentional and arbitrary discrimination, whether occasioned by express terms of a statute or by its improper execution through duly constituted agents." *Id.* (internal quotation marks omitted).

■ "[A] class-of-one plaintiff must show, among other things, an extremely high degree of similarity between [herself] and the persons to whom [she] compare[s] [herself] in order to succeed on an equal protection claim." *Doninger v. Niehoff,* 527 F.3d 41, 53 (2d Cir.2008) (internal quotation marks omitted). "[T]he standard for determining whether another person's circumstances are similar to the plaintiff's must be ... whether they are *prima facie* identical." *Neilson v. D'Angelis,* 409 F.3d 100, 104 (2d Cir.2005) (internal quotation marks omitted).[6] The Second Circuit requires a "class-of-one" plaintiff to show that:

---

**6.** *Neilson* involved the application of the class-of-one equal protection theory in the public employment context. Subsequent to the decision in *Neilson,* however, the Supreme Court explicitly held that "the class-of-one theory of equal protection does not apply in the public employment context." *Engquist v. Oregon Dept. of Agr.,* — U.S. —, 128

S.Ct. 2146, 2151, 170 L.Ed.2d 975 (2008). Thus, the Second Circuit "overrule[d] [*Neilson* ] ... to the extent that it conflicts with the holding of *Engquist.*" *Appel v. Spiridon,* 531 F.3d 138, 139–40 (2d Cir.2008). Nevertheless, *Neilson's* discussion regarding "similarly situated" individuals in the context of class-of-one equal protection claims remains valid.

(i) no rational person could regard the circumstances of the plaintiff to differ from those of a comparator to a degree that would justify the differential treatment on the basis of a legitimate government policy; and (ii) the similarity in circumstances and difference in treatment are sufficient to exclude the possibility that the defendant acted on the basis of a mistake.

*Neilson*, 409 F.3d at 105. "[T]his test is simply an adaptation of the rational review standard applicable to equal protection 'class of one' cases." *Id.* at 105 n. 3; *see Weinstein v. Albright*, 261 F.3d 127, 140 (2d Cir.2001) (noting that rational basis review applies to equal protection claims not based on plaintiff's membership in a suspect class or on effects of the challenged action on fundamental rights).

■ In their class-of-one equal protection analysis, the Plaintiffs compare themselves to Richard and Krystine Rohner ("the Rohners"). The Rohners, like the Plaintiffs, purchased a house on Bunker Hill Road in Coventry that was built by the Contractor Defendants. The Rohners' house, like the Plaintiffs', had a number of defects. According to the Plaintiffs, the Rohners refused to permit Chiulli on their property to remedy those defects "unless they had safeguards at least as stringent as those the [P]laintiffs requested." (Dkt.# 97–1, pp. 17–18.) The Plaintiffs allege that, despite these similarities, Callahan issued a violation notice to them, but not to the Rohners.

The Municipal Defendants argue that Callahan had reason to issue a violation notice to the Plaintiffs, but not to the Rohners. Although the Rohners, like the Plaintiffs, restricted Chiulli's access to their respective properties, the Rohners, unlike the Plaintiffs, had agreed to enter into arbitration to resolve their dispute with Chiulli. There is no evidence that the Plaintiffs did the same.

According to Callahan, the Plaintiffs refused to work with Chiulli. The Plaintiffs deny this. They support their denial with a letter, dated October 6, 2004, sent from their lawyer, Steven M. Basche ("Basche"), to Callahan, wherein Basche represented that, while the Plaintiffs had misgivings about Chiulli, they would have "no problem with Mr. Chiulli's contractors correcting the work." (Dkt.# 97, Ex. 11.) Nevertheless, the Plaintiffs have also submitted a letter, dated January 18, 2005, sent from Basche to Chiulli, wherein Basche stated that, although the Plaintiffs did not object to "certain of [Chiulli's] subcontractors having an opportunity to finish or repair . . . prior work," they would not allow Chiulli on the job site, and that "certain of [Chiulli's] subcontractors will not be allowed back to try to correct defective work because they have already demonstrated that they are not able to do the work properly." (*Id.*, Ex. 12.) Based on the above, it was not entirely unreasonable for Callahan to believe, even if such a belief were a mistake, that the Plaintiffs (apparently with good reason) were refusing to allow Chiulli and at least some of his subcontractors to fix defects on the Property.

In sum, both the Plaintiffs and the Rohners had problems with the Contractor Defendants' work. Although the Plaintiffs claim that they were willing to work with the Contractor Defendants, both the Plaintiffs and the Rohners placed at least some restrictions on whom they would allow to fix the defects on their properties. The Rohners, however, agreed to enter into arbitration proceedings with Chiulli. The Plaintiffs did not. In the court's view, this difference in circumstances is sufficient to justify Callahan's decision to issue a violation notice only to the Plaintiffs. That is, the court finds the Plaintiffs and the Rohners are not similarly situated for this class-of-one equal protection analysis. Consequently, with regard to the Plain-

tiff's *Olech*-based class-of-one equal protection claim, the Municipal Defendants' motion for summary judgment (**dkt.# 81**) is **GRANTED.**

b. *LeClair* "Selective Enforcement"

 In *LeClair* and its progeny, the Second Circuit has provided an equal protection argument that plaintiffs may use as an alternative to the "class-of-one" standard set forth by the Supreme Court in *Olech*.[7] In this circuit, a plaintiff may bring an equal protection claim by alleging "selective enforcement." To succeed in such an equal protection action, plaintiffs in this circuit must show both "(1) that they were treated differently from other similarly situated individuals, and (2) that such differential treatment was based on impermissible considerations such as race, religion, intent to inhibit or punish the exercise of constitutional rights, *or malicious or bad faith intent to injure a person.*" *Harlen Assocs.*, 273 F.3d at 499 (emphasis added) (internal quotation marks omitted); *see LeClair*, 627 F.2d at 609–10. The Second Circuit has warned, though, that "cases predicating constitutional violations on selective treatment motivated by ill-will, rather than by protected-class status or an intent to inhibit the exercise of constitutional rights, are lodged in a murky corner of equal protection law in which there are surprisingly few cases and no clearly delineated rules to apply." *Bizzarro v. Miranda*, 394 F.3d 82, 86 (2d Cir.2005) (internal quotation marks omitted). Indeed, the Second Circuit has "frequently referred to the *LeClair* formulation in [this] circuit, ... but rarely [has] found a constitutional violation." *Id.* (collecting cases).

 As this court has held previously, "demonstrating that a plaintiff has been treated differently from similarly situated individuals is 'the *sine qua non* of a *Le-*

*Clair* "selective enforcement" violation.'" *Goldfarb*, 474 F.Supp.2d at 368 (quoting *John Doe No. 1 v. Village of Mamaroneck*, 462 F.Supp.2d 520, 555 (S.D.N.Y.2006)). The similarly situated standard here is the same as that for *Olech* class-of-one claims. *See id.* The court has already found that the Plaintiffs have not satisfied this burden. Thus, their selective enforcement equal protection claim fails on that ground.

 In addition, there is no real evidence of any malicious or bad faith intent to injure the Plaintiffs. The Plaintiffs submit no evidence of any ill-will that Callahan may have harbored toward them; indeed, they do not even argue that Callahan maliciously intended to harm them. Absent such a showing, the Plaintiff's selective enforcement equal protection claim fails. Consequently, with regard to the Plaintiff's *LeClair*-based selective enforcement equal protection claim, the Municipal Defendants' motion for summary judgment (**dkt.# 81**) is **GRANTED.**

## C. STATE CLAIMS

 In light of the foregoing, the only remaining claims in this case are the allegations against Al–Fred for violating the New Home Construction Contractors Act and the Connecticut Unfair Trade Practices Act, both of which are Connecticut statutes. The court notes, that, when all of a plaintiff's federal claims have been dismissed, it can decline to exercise supplemental jurisdiction over the state law claims pursuant to 28 U.S.C. § 1367(c) if it determines that exercising supplemental jurisdiction would not promote economy, convenience, fairness, and comity. *See Itar–Tass Russian News Agency v. Russian Kurier, Inc.*, 140 F.3d 442, 446 (2d Cir.1998). "Certainly, if the federal claims are dismissed before trial, even though not

---

**7.** The court notes that *LeClair* was, in fact, decided before *Olech*.

insubstantial in a jurisdictional sense, the state claims should be dismissed as well." *Castellano v. Bd. of Trs. of the Police Officers' Variable Supplements Fund,* 937 F.2d 752, 758 (2d Cir.1991) (quoting *United Mine Workers v. Gibbs,* 383 U.S. 715, 726, 86 S.Ct. 1130, 16 L.Ed.2d 218 (1966)). "If it appears that the federal claims ... could be disposed of on a motion for summary judgment under F.R.Civ.P. 56, the court should refrain from exercising pendent jurisdiction absent exceptional circumstances." *Kavit v. A.L. Stamm & Co.,* 491 F.2d 1176, 1180 (2d Cir.1974).

■ The court does sympathize with the Plaintiffs, who obviously have had many personal and professional difficulties with their contractor. Indeed, with regard to this particular contractor, it appears that the Plaintiffs' difficulties were not even singular. In this case, however, the court believes that the Plaintiffs remaining claims should be heard in state court. To permit otherwise would amount to "allowing a federal tail to wag what is in substance a state dog." *Borough of West Mifflin v. Lancaster,* 45 F.3d 780, 787 (3d Cir.1995). Moreover, the interests of federalism and comity favor litigating the state-law issues in state court. *See Valencia ex rel. Franco v. Lee,* 316 F.3d 299, 306 (2d Cir.2003). Consequently, the state law claims against Al–Fred are hereby DISMISSED without prejudice to the Plaintiffs bringing those claims in state court.

### III. CONCLUSION

For foregoing reasons, the Municipal Defendants' motion for summary judgment (**dkt.# 81**) is **GRANTED,** and Chiulli's motion for summary judgment (**dkt.# 87**) is **GRANTED. Judgment in favor of the Town of Coventry, Joseph Callahan, and Alfred Chiulli shall enter on all claims against them in the complaint. The Plaintiffs' remaining state law claims against Al–Fred Builders & Developers,** LLC are DISMISSED without prejudice to the Plaintiffs bringing those claims in state court. The clerk shall close this file.